[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 16-10868

_____

LYNDON FITZGERALD PACE,

Petitioner-Appellant,

*versus*

WARDEN, GEORGIA DIAGNOSTIC AND CLASSIFICATION PRISON,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:09-cv-00467-WBH

_____

Before WILSON, ROSENBAUM, and LUCK, Circuit Judges.

LUCK, Circuit Judge:

In seven months, Lyndon Pace raped and strangled to death four women, three of whom were more than seventy-eight years old. He was convicted and sentenced to death for the murders. He now appeals the denial of his petition for a writ of habeas corpus under 28 U.S.C. section 2254.

Pace makes five arguments on appeal. First, he contends that the Georgia Supreme Court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in denying his claim that his trial counsel were ineffective because they failed to investigate and present available mitigation evidence. Second, he argues that the Georgia Supreme Court either failed to apply or unreasonably applied *Darden v. Wainwright*, 477 U.S. 168 (1986), in denying his claim that the prosecutor's sentencing phase closing argument violated his right to a reliable sentencing under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Third, he asserts that the Georgia Supreme Court unreasonably applied *Strickland* in denying his claim that his trial counsel were ineffective for failing to object to parts of the prosecutor's sentencing phase closing argument. Fourth, he argues that the Georgia Supreme Court unreasonably applied clearly established federal law in concluding that the state trial court's admission of evidence that he burglarized Coretta Scott King, the widow of Dr. Martin Luther King, Jr., did not violate his right to a reliable sentencing. And fifth, he contends that

the Georgia Supreme Court unreasonably applied *Simmons v. South Carolina*, 512 U.S. 154 (1994), in concluding that the state trial court's refusal to inform the jury about his eligibility for parole did not violate his right to a reliable sentencing. After careful review of the briefs and the record, and with the benefit of oral argument, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### *The Murders*

On August 28, 1988, Lula Bell McAfee, age eighty-six, was found dead in her home in Atlanta. She was naked and lying face down on her bed, with a pillow underneath her stomach that pushed her pelvis up, exposing her vaginal and rectal areas. Blood was pouring out of her mouth and her bra and a strip of cloth were tangled around her neck. Her bathroom window was open and the window screen had been removed and left lying on the ground. Her bedroom was "completely ransacked" and a briefcase, car keys, and money were missing. Ms. McAfee's autopsy established that she had been strangled to death. The presence of lubricant on her vaginal and rectal areas suggested that she had been sexually assaulted. Swabs from her breasts revealed the presence of saliva, and vaginal and rectal swabs revealed the presence of sperm. Ms. McAfee had known Pace "since he was a baby."

On September 10, 1988, Mattie Mae McClendon, age seventy-eight, was found dead in her home in the Vine City area of Atlanta. She was lying in her bed with bloodstained sheets pulled

over her body.  Her bathroom window was open, the window screen had been torn apart from the outside, and a tree limb just outside the window was broken.  Ms. McClendon's autopsy showed that she had been strangled to death and suffered "a very large" vaginal laceration "with a large amount of hemorrhage coming from it."  Rectal swabs taken from her body revealed the presence of sperm.

On February 4, 1989, Johnnie Mae Martin, age seventy-nine, was found dead in her home in the Vine City area of Atlanta.  She was lying on her bed with a pillow over her head.  Her bloodstained nightgown was pulled up around her breasts, a shoelace was wrapped around her neck, and the rest of her body was naked with her legs spread open.  A side window was open, the window screen had been pushed back, and a ladder was just under the window on the outside of the house.  The house was "ransacked."  Ms. Martin's autopsy established that she had been strangled to death and suffered a vaginal laceration and other injuries in her vaginal area.  Rectal swabs taken from her body revealed the presence of sperm.

On March 4, 1989, Annie Kate Britt, age forty-two, was found dead in her home in Atlanta.  Ms. Britt was lying naked in her bed with a sock knotted tightly around her neck.  Someone had pried open a back window, the window screen was lying on the ground, and a pipe underneath the outside of the window was loose and detached from the wall.  The house was "ransacked."  Ms. Britt's autopsy established that she had been strangled to death, and a broken fingernail, bruises, and scrapes on her body were

"consistent with her fighting with her attacker at the time that she was strangled." Her autopsy revealed multiple tears in her anus that appeared as if they had occurred after she died, and rectal and vaginal swabs revealed the presence of sperm.

More than three years later, on September 24, 1992, Sarah Grogan, age sixty-nine, woke up to find that someone had broken into her home in the Vine City area of Atlanta. Ms. Grogan left her bedroom and found a man in her kitchen. As the man chased her back to her bedroom, Ms. Grogan slammed the bedroom door in the man's face. Ms. Grogan got her gun and shot through the door, but the man wasn't there when she opened it to see if her shot had hit him. As she left the bedroom, the man "took a shot at [her]," but she "r[a]n to the front door and got out." Police discovered that the burglar had broken into Ms. Grogan's house through a rear kitchen window where the screen had been ripped from its frame. Investigators took fingerprints from the rear window and from other items that the man touched.

Less than a week later, on September 30, 1992, Susie Sublett, an elderly woman living in the Vine City area of Atlanta, woke up to find a man in her bedroom searching through her purse. The man had broken into her home through a side window. Ms. Sublett confronted the man, and he threatened to "blow [her] brains out." Ms. Sublett fought the man and chased him out of the window he had broken in through. Ms. Sublett's phone lines had been cut and so had her neighbors', so she called the police from another neighbor's house. When the police arrived, they found that the

side window's screen had been removed and that there was a milk crate on the ground below the window. Police took fingerprints from the window screen and from other items that the man touched.

The fingerprints taken from Ms. Grogan's and Ms. Sublett's homes matched Pace's, which were on file from an earlier conviction. Police obtained a warrant and arrested Pace. Pace agreed to give the police samples of his hair and blood. Pace's pubic hair matched hair samples taken from Ms. Martin's and Ms. Britt's murders. And the sperm found in each of the murder victims matched Pace's DNA.

A grand jury in Fulton County, Georgia, charged Pace with four counts of malice murder, four counts of felony murder, four counts of rape, and two counts of aggravated sodomy. The state sought a death sentence for each of the four malice murders. Under Georgia's death-sentencing statute, the case was set for a bifurcated jury trial with a guilt phase and a sentencing phase. *See* O.C.G.A. § 17-10-2(c). The jury had to find at least one statutory aggravating circumstance at the sentencing phase to recommend a death sentence. *See id.* § 17-10-30(c). At the sentencing phase, Pace had the right to present any mitigation evidence weighing against the imposition of the death penalty. *See, e.g.*, *Crowder v. State*, 491 S.E.2d 323, 325 (Ga. 1997) ("Under Georgia's statutory death-penalty statute, any evidence that relates to the defendant's character, prior record, or the circumstances of the offense is admissible as mitigating evidence.").

16-10868                Opinion of the Court                7

*Trial Counsel's Investigation of Mitigation Evidence*

Three attorneys were appointed to represent Pace. Two of the attorneys, Michael Mears and Nancy Mau, were from the Office of the Multi-County Public Defender, a law office dedicated to handling death penalty trials statewide. The third, Bruce Harvey, was a criminal defense attorney in private practice. Mr. Mears served as lead counsel. Ms. Mau "assumed responsibility for the majority of the actual workup of the case" and Mr. Harvey's role "was solely to handle scientific evidence in the guilt [and] innocence phase, namely the DNA evidence."

Trial counsel's "focus . . . all along was reasonable doubt of . . . Pace's guilt." They sought to establish reasonable doubt at the guilt phase by highlighting an "overzealous prosecution" and showing that the procedures used to match Pace's DNA to the DNA collected from the murder victims were unreliable. If Pace was convicted, trial counsel's strategy for the sentencing phase was to establish "residual doubt"[1] and to show that Pace's family was

---

[1] "A residual doubt theory during mitigation essentially asks the jury to consider as mitigating any lingering doubt that they might still have as to the defendant's guilt." *Moore v. Mitchell*, 708 F.3d 760, 785 n.12 (6th Cir. 2013) (applying Ohio law); *accord Wade v. State*, 401 S.E.2d 701, 705 n.3 (Ga. 1991) (Hunt, J., concurring) ("[A] *residual* doubt [is] a doubt *leftover* from the finding of guilt."). "It operates in the space between certainty 'beyond a reasonable doubt' and 'absolute certainty.'" *Moore*, 708 F.3d at 785 n.12; *see Stewart v. Dugger*, 877 F.2d 851, 856 (11th Cir. 1989) (describing trial counsel's

"pleading for mercy." In preparation for their mitigation defense, Pace's trial counsel interviewed Pace, his family, a former girl-friend, friends, and teachers, gathered Pace's background records, hired a "mitigation specialist and investigator" to assist with their investigation, and retained a mental health expert to examine Pace.

<u>Trial counsel interviewed witnesses and gathered Pace's records</u>

Ms. Mau was assigned responsibility for the sentencing phase of Pace's trial. To prepare a mitigation strategy, Ms. Mau first spoke with Pace's mother and several of his siblings. Pace's mother mentioned that Pace had a "particularly bad" head injury as a child and that she thought it might have affected his performance at school. The injury required medical treatment and, after the injury, Pace "had headaches and [was] vomiting" for a "long time." In response, Ms. Mau explained to Pace's mother that it would be important to know if Pace had "learning problems" because "then the [s]tate might not be able to even have a [death penalty] trial." Pace's mother "seemed to understand," "talked more liberally" about Pace's head injuries, and "even ventured to say that [Pace] ha[d] always been a 'slow learner.'"

Ms. Mau also reached out to some of Pace's siblings. One sister, Lisa, said that Pace was "not a drug user." Ms. Mau believed that Lisa was "close enough to [Pace] to know whether he was

---

"lingering doubt" defense as creating "some seed of doubt, even if insufficient to constitute reasonable doubt").

using drugs or not when he was arrested" for the murders. Lisa also told Ms. Mau that there were several character witnesses from Pace's neighborhood who would testify that he cared for them and wouldn't be capable of committing the crimes he was charged with.

At the same time, Ms. Mau sought Pace's medical and school records. Despite repeated attempts, trial counsel weren't able to get Pace's childhood medical records because they hadn't been kept by the hospital. Trial counsel did, however, get Pace's school records, which were "disastrous." The records showed that Pace "did extremely poorly in school, was absent far more than he attended, repeated third grade three times and was socially promoted several times, and that he was reading on a first grade level at the age of [twelve]." Pace's family wasn't helpful in explaining his problems at school, "although they did relate that he was clumsy, fell down a lot, suffered terrible headaches, and had suffered at least one very severe head injury as a child." They dismissed Pace's poor performance at school by saying that he "had headaches or didn't want to go to school."

Ms. Mau interviewed Pace to learn about his upbringing. Pace said that his parents separated when he was a teenager, but he didn't understand why because "he never knew anything was wrong" and they "never argued in front of" him or his siblings. Pace had eight siblings, and his father had "lots of children of his own." There were "no hard feelings" between Pace's family and his father's "new wife and family." Pace described growing up in a

big family: "fun, exciting, family life, BBQ's, always someone around." He said his father was a "good" man and that both of his parents were strict and punished him when he misbehaved. Pace said that he had "lots of close friends" and knew "mostly everyone in his neighborhood."

Pace confirmed that he dropped out of school in the seventh grade and said it was because the schools where he grew up "weren't that good" and "didn't really inspire the children to learn." The bad schools, "coupled with his home life and bad neighborhood, made attendance in elementary school or any school seem less significant than having a job earning money." Pace added that he might have been in a "special class as a kid" and that a teacher said he was "slow" or a "remedial reader." Pace told Ms. Mau that he had started writing poetry in jail, but Ms. Mau was skeptical whether Pace could even read.

Pace said that he "got in with the wrong crowd" after he left school and that he started selling alcohol and drugs. He "got in trouble for the first time" when he was sixteen or seventeen years old for trespassing and was put on probation. He had a few odd jobs and moved around a lot, but when he wasn't working, he "hung around the streets" and sold drugs—"mostly cocaine and marijuana"—to support himself. Pace admitted he snorted cocaine but denied ever using or selling crack. He also said that he almost lost his life over a bad drug deal where he was "struck in the head with a pipe and left for dead." Pace mentioned that he had been incarcerated for other convictions as well.

Pace also recounted the same head injury described by his mother, explaining that it happened when he jumped out of a parked car as a young child. And he said that he sustained other head injuries, too. Pace noted that he sometimes suffered from headaches and dizziness and that, although his eyesight was generally okay, it "used to sort of 'black-out' and then come back on."

Along with Ms. Mau's interview with him, Pace wrote trial counsel a letter summarizing his life, noting that it consisted of "accidents, pain, [and] mistakes" but also "joy, happ[i]ness, and love." He wrote that he used to have "a lot of accidents" and referenced the same head injury he mentioned to Ms. Mau. He also recalled an incident where he was playing on a swing and knocked himself unconscious for three days but wasn't hospitalized. After that, Pace had "nothing but constant bad headaches on the left side of [his] head" and used to "throw-up a lot." He "couldn't stand loud noises," and the only thing he could do to stop the pain was go somewhere quiet and sleep.

Pace also said that he "wasn't a stupid child." He noted his resourcefulness with electronics, explaining that at age fourteen he fixed a broken television his mother had planned to throw away. And he said that he dropped out of school because he "got real frustrated with the situation and quit." Mr. Mears wrote back to Pace and asked him to share as much information as he could about the two accidents he described where he injured his head and to make a list of names and addresses of potential character witnesses.

Trial counsel hired an investigator to assist in their investigation

Trial counsel hired a "mitigation specialist and investigator," Pam Leonard, to assist with Pace's case. Investigator Leonard met with Pace "to begin work on [his] social history." She noted that Pace was "pleasant, cooperative[,] and attentive throughout [their] discussion."

Pace told Investigator Leonard that his family was "constantly moving around" when he was young, but he didn't know why. Pace said that he was "always having accidents" as a child and "constantly hit his head." Pace also said he never felt sad for a prolonged period until he was twenty-seven years old and broke up with his girlfriend, Trina Todd. At that time, he was "so depressed that he even considered suicide."

Pace detailed his history of alcohol and drug use. He said he first tried alcohol when he was five or six years old and didn't try it again until he was fourteen. By the time he was sixteen, he was "drinking beer like water" and "needed a perpetual buzz" to "keep away the pressures." When he was twenty-seven, he was drinking "a couple of six packs of beer" every weekend and was "only trying to get relaxed and didn't drink to get drunk." He denied ever being dependent on alcohol and said he could have stopped whenever he wanted.

Pace first used drugs when he was fifteen or sixteen years old. At the time, he "smoked a lot of weed" every day. He eventually "cut back to being a weekend user after a couple of years of

everyday use of drugs and alcohol." He started selling and using cocaine when he was seventeen or eighteen. Pace said he used cocaine "to push the pain away," but he stopped using it after it nearly gave him a heart attack. He kept smoking marijuana, though, and by the time he was twenty-seven he was "smoking a nickel bag . . . each weekend." He explained that selling drugs was "the way of life" in the neighborhoods where he grew up, and he said that "[t]hings were not available to [him] and there was no way out."

Investigator Leonard also interviewed three of Pace's former teachers, only one of whom—Doris Grissom—claimed to remember Pace. Ms. Grissom thought that Pace "probably was not evaluated for special ed[ucation] due to his extreme absenteeism combined with the long wait for evaluations." She said that Pace "came from a family where the children fended for themselves[,] and he often did not have clean clothes or sufficient food." According to Ms. Grissom, Pace's mother never came to school when asked, and "there was no one to enforce the attendance rules." Ms. Grissom also knew that Pace lived in a "terrible place" known as "little Vietnam" where "[u]nattended small children roamed around at all hours while older kids sniffed glue and smoked pot in plain view." Investigator Leonard wasn't convinced that Ms. Grissom remembered Pace and instead suspected that Ms. Grissom remembered "a composite of the many kids like him at her school, which ha[d] a high population of poor kids." Pace was never assigned to Ms. Grissom's class, and she had taught at the school for thirty-two years.

Ms. Mau spoke with Trina Todd, Pace's former girlfriend. Ms. Todd said she dated Pace "during the time some of the[] killings occurred" and that "she never saw any indication that anything was wrong." Ms. Todd had known Pace and his family for a long time and thought that the crimes Pace was charged with were "out of character for him." She said Pace "was not capable" of committing the crimes he had been charged with.

Investigator Leonard also interviewed Ms. Todd. Ms. Todd told Investigator Leonard that she had known Pace's family for about ten years and first started dating Pace in 1982, during her senior year of high school. They broke up and didn't start dating again until the early 1990s. Ms. Todd "emphatically" said that Pace's charges "didn't click" with her because Pace was such a "quiet" person and "was particularly respectful toward the elderly."

Ms. Todd also said that Pace had an "overwhelming need for her" while they were dating because he didn't have a car or "stable residence," had a criminal record, and was "barely literate." Ms. Todd was never afraid of Pace because he didn't hit her, but he kept calling her even after they broke up, so she filed harassment charges against him "just to scare him a little." Ms. Todd was aware of Pace's drug use, but he never used drugs in front of her or "let it get out of control while they were together."

Ms. Mau and Investigator Leonard interviewed several of Pace's family members and family friends. Before the individual interviews, Ms. Mau, Investigator Leonard, and Mr. Mears met as

a group with Pace's mother, his sister Lisa, his brother Garry, and Garry's wife, Penny.  During the meeting, trial counsel "described the scope and purpose of mitigation evidence in a bifurcated trial." In response to the family's questions about the state's charges against Pace, Ms. Mau "point[ed] out the problems in the [s]tate's case" but "emphasized that [Pace] [was] in a lot of trouble" and so they "need[ed] to plan for a sentencing phase."  Pace's family members seemed "more interested in proving [Pace's] innocence" but "listened respectfully" and "seemed to understand the benefit of mitigation."  Pace's mother provided trial counsel with the names and contact information for each of Pace's siblings and "several people who kn[e]w [Pace] and the Pace family."

After the group meeting, Ms. Mau and Investigator Leonard began their individual interviews.  Pace's brother Darrell said he knew Pace "was doing some drugs" and Darrell had tried to persuade Pace to stop smoking marijuana.  Darrell described Pace as "easy going" and said that Pace would "joke[] all the time."  He explained that Pace's "nieces and nephews loved him and he got along with everybody."  Darrell said, "There's no way [Pace] could have done it."  Darrell also "credit[ed] [Pace] with saving his life" because Pace "once pulled [him] out of a swimming pool because he was drowning."

Pace's brother Garry—a recently retired Army sergeant— explained that "[j]ust because you're raised in that neighborhood doesn't mean you'll be a hoodlum."  Garry knew that Pace "was involved in drugs" and "repeatedly warned [him] about the cycle

of lawbreaking that goes with drug addiction." Both Garry and his wife Penny "rejected the idea of [Pace] being slow." They noted "his teaching himself to play the guitar by ear, teaching himself to drive[,] and his ability to dismantle mechanical objects as examples of above average traits." They couldn't explain Pace's poor performance at school. To them, "the only unusual thing about [Pace] [was] his tendency to have severe headaches." Garry had "never seen any abnormal behavior in [Pace]" and said that Pace was "not capable of committing these murders." Penny thought that Pace "might have been a thief" but insisted that he was "not a violent person" and "wouldn't harm an old woman." Even after Ms. Mau told them about the state's evidence against Pace, including the matching fingerprints and DNA, Garry and Penny "steadfastly maintained their disbelief that [Pace] committed four murders."

Pace's brother Gregory—an Army veteran like Garry—said he lived with Pace in the early 1990s and that Pace "was using drugs rather carelessly." But Gregory maintained that Pace "remained even tempered," and he "seriously and unequivocally" said that Pace was "not capable of these murders." After interviewing Garry, Penny, and Gregory, Investigator Leonard thought that they would "be very good mitigation witnesses" because "[t]hey [were] hard working, attractive[,] and articulate people who understand the theatrical qualities of a trial and [she] believe[d] they w[ould] hold steadfast to their proclamation that [Pace was] not capable of committing these murders."

Pace's sister Jennifer said that Pace's drug problem got "pretty bad" in 1992 when, despite being "characteristically well-groomed," Pace started appearing "unkempt." And Pace's sister Patty said that she thought Pace "got into drugs and petty crime because he couldn't read." But she thought that Pace "was doing quite well" at the time he was arrested. Patty also mentioned that Pace's parents "drank a little and argued often," sometimes getting into physical fights. Patty even had to intervene in one of her parents' fights by threatening to hit them with a pressure cooker lid. She also noted that Pace's father later went to prison for kidnapping his common-law wife. Patty was "adamant that [Pace] could not have committed the crimes . . . because he respected older people and often ran errands for them and watched out for them."

Pace's mother said that she ended her marriage with Pace's father because he was spending money on other women and let their house get repossessed. She tried not to fight in front of her children while they were together, but it was hard not to. Their fights occasionally got physical, and one time she had to get the police involved. After they split up, Pace's mother relied on public assistance for several years.

Pace's mother also described the head injury Pace suffered as a young child, noting that his skin didn't break and that she treated his head with rubbing alcohol. She started to worry about a week after the injury "because [Pace] couldn't stand for anybody to shake him," so she took him to the hospital where he received medical treatment. The hospital "lanced [his injury] to get all th[e]

dried blood out and packed it with gauze so it could drain." Pace's mother was concerned about "long term problems" he may have suffered from the accident.

Mary Ann Booker, a longtime family friend, said that she had known Pace's mother since the 1970s. Ms. Booker said that "[t]he Pace family stuck together" and that Pace was "one of them likeable little guys." "[S]he was totally shocked to learn" that Pace had been arrested for the murders.

Ida Turner, another longtime family friend, said that she "watched [Pace] grow up and [she'd] never known him to be violent." Ms. Turner said Pace was "gentle, quiet, mannerable[,] and respectful." Ms. Turner "believe[d] they ha[d] the wrong man."

Together with the interviews, Ms. Mau and Investigator Leonard sought Pace's and his parents' background records. They tried to get Pace's and his parents' birth certificates, medical records, school records, social security records, employment records, and criminal and civil court records. Trial counsel compiled the information from the interviews and the background records they obtained into a detailed "social history chronology" of Pace's family dating to 1875.

Trial counsel retained a mental health expert to examine Pace

Trial counsel also arranged for Pace to be evaluated by Dr. Dennis Herendeen, a clinical psychologist. The purpose of the evaluation was to screen for "mental retardation" and "organic brain damage." Investigator Leonard met with Pace twice to

prepare him for the evaluation and to explain what was happening. Investigator Leonard also sent Dr. Herendeen a set of memoranda she had prepared while interviewing Pace and his family and the social history chronology that trial counsel had prepared. Investigator Leonard told Dr. Herendeen about Pace's "tendency to fall and hit his head," his "significant head injury around age six," his "poor school performance . . . and low reading level," and his "severe persistent headaches."

Dr. Herendeen met with Investigator Leonard at the jail to evaluate Pace. While they waited for Pace to arrive, Investigator Leonard "talk[ed] at length with [Dr. Herendeen] about the evils" of the Minnesota Multiphasic Personality Inventory (MMPI), a psychological test common in forensic settings. Investigator Leonard explained that trial counsel considered the MMPI to be "a sensationalizing blunt instrument of the state" that could be used against Pace. Investigator Leonard "d[idn't] expect [Pace] to do well on any personality test" and thought it "ma[de] little sense . . . to administer a psychological test" that they'd have to "rebut in an attempt to rehabilitate our client, who is usually charged with being a malingering sociopath." So she "press[ed Dr. Herendeen] to take a measured approach to psychological testing by doing some initial screening [and] then looking for correlates in the literature . . . for guidance on what additional tests to administer." Dr. Herendeen "agreed fully with th[at] approach."

To screen for mental disability, Dr. Herendeen administered a "Shipley Institute of Living Scale." Pace's estimated IQ from the

Shipley test was 78, which Dr. Herendeen didn't consider to be "promising" for a mental disability defense. To screen for academic achievement, Dr. Herendeen administered the reading section of the "Wide Range Achievement Test, Third Revision." That test showed that Pace read at approximately a fifth grade level, which was consistent with his IQ score.

Dr. Herendeen also administered the "Personality Assessment Inventory," which was a personality scale similar to the MMPI. The test covered a variety of mental health issues including paranoia, mania, anxiety-related disorders, schizophrenia, and drug problems. Pace "had significant elevation on the paranoia scale, and was markedly elevated on the mania scale, notably in feelings of grandiosity which could reach the level of delusional belief." His schizophrenia scale was also "somewhat elevated." The overall results of the Personality Assessment Inventory suggested to Dr. Herendeen that he should rule out a diagnosis of "organicity" or "bipolar disorder."

Finally, Dr. Herendeen reviewed a "Neuropsychological Symptoms Checklist" with Pace and administered the "Trail Making Test" to him. Pace's responses to the checklist suggested that he "heard unusual sounds," experienced periods where he forgot where he was, and had problems communicating. Pace "performed extremely poorly on [the Trail Making Test], clearly indicating organic impairment and frontal lobe damage."

Dr. Herendeen told Investigator Leonard that his evaluation "showed . . . Pace to have borderline intelligence and organic brain

damage." They discussed "which full scale test should be administered to follow up on the mental retardation issue," and Dr. Herendeen also told Investigator Leonard that "the results of the other testing indicated further evaluation should be pursued." But trial counsel decided not to pursue further testing or have Dr. Herendeen testify at trial. According to Mr. Mears, Dr. Herendeen's evaluation "did not turn up anything to change our approach."

*The Trial*

Pace's trial took place from January to March 1996. After the guilt phase of the trial, the jury convicted Pace for the four murders. The trial then moved to the sentencing phase, which took place over three days.

<u>The state's presentation of aggravating evidence</u>

During the sentencing phase, the state introduced evidence of other burglaries Pace had committed, including the 1990 burglary of Coretta Scott King's home. A detective with the Atlanta Police Department who investigated the burglary of Mrs. King's home testified that Pace's fingerprints matched fingerprints "found on the window ledge on the inside of the house" and that she found items that had been stolen from Mrs. King's home in Pace's apartment. And a technician with the Atlanta Police Department testified that he determined that the fingerprints he took from Mrs. King's window ledge matched Pace's.

Trial counsel's presentation of mitigation evidence

Pace's trial counsel called eleven witnesses to plead for mercy on his behalf and to establish residual doubt of his guilt.

Ms. Booker testified that she had known Pace's family since 1978, when she became friends with his mother. Pace's mother raised her kids by herself, but Ms. Booker thought she was a "good mother" who did the best she could. Pace was a young and "real likeable" child when Ms. Booker met him. Ms. Booker described Pace as "just like any other normal child," "a good kid," and an "easy" and "caring" person who wouldn't harm anyone. Ms. Booker never saw Pace acting in a mean or disrespectful manner to anyone. Pace treated his family "very well," and they always seemed to be "a big happy family." Ms. Booker explained that her grandson had problems with juvenile delinquency and that Pace had "a real big impact" in motivating her grandson to stay in school by telling him about life in jail. Ms. Booker asked the jury to have mercy on Pace and said that she thought he was innocent. On cross-examination, Ms. Booker conceded that Pace was "just a child" when she "knew him growing up" and that she didn't know him as an adult.

Ms. Turner testified that Pace's mother was her best friend. Ms. Turner had known Pace since he was about three years old and continued to see him as he grew up and became a teenager. Pace was "always quiet, kind, very respectful," and had a "very loving" nature. Ms. Turner never saw Pace act disrespectfully toward

anyone.  He had a "very loving" home, and Ms. Turner never saw Pace's mother mistreat him.  Ms. Turner asked the jury to "have mercy" on Pace because she believed he was innocent.  She felt that Pace was the type of person who deserved to live rather than be executed.  On cross-examination, Ms. Turner conceded that she "just kn[e]w [Pace] as a child and as a teenager" and did not know Pace as an adult.

Pace's brother Garry testified that he and Pace lived in housing projects, moved around a lot, and had a low income.  But he said they weren't "the average run-of-the-mill family from where [they] grew up."  They had a "very close-knit family" and didn't have any fights.  Garry said that Pace was "an easy-going, quiet person" who never got into trouble or had arguments.  He was "even-tempered" and didn't hate anyone.  Garry testified that their mother did her best to discipline her eight children and to keep them out of trouble.  Garry said that he thought Pace was innocent because he knew "the kind of person that" Pace was.  He asked the jury to "take it in their hearts" and to have mercy on Pace.

Pace's brother Darrell testified that Pace was always a quiet person, didn't get into too much trouble, and never got into fights. Darrell told the jury about how, when Pace was fifteen or sixteen years old, he saved Darrell from drowning by pulling him out of a pool and giving him CPR.  Darrell said that he "d[id]n't think [Pace] did it" and asked the jury to "have compassion" for Pace's mother and the rest of his family by sparing Pace's life.

Pace's sister Jennifer testified that she could always count on Pace to take care of her when she couldn't care for herself. Jennifer also said that she knew Pace had a "drug problem" and that she encouraged him to "beat it" by avoiding the people who were negatively influencing him. Jennifer asked the jury "to have mercy for [her] brother" and said that if the jury were to sentence him to death it would "would leave . . . a deep scar" in her family. She said that she "d[id]n't think [her] brother did it."

Pace's brother Gregory testified that he never saw Pace treat anyone disrespectfully and that Pace "g[a]ve respect to his elders." Pace often helped their sick aunt and elderly neighbors with errands. Pace even sat with an elderly neighbor who wanted company while taking a nap. Gregory said that he knew Pace was "the type of person that cares for elderly people." Gregory asked the jury to have mercy on Pace. Gregory said that if Pace "ha[d]n't admit[ted] to it, he ha[d]n't done it."

Ms. Todd testified that she and Pace had been "boyfriend and girlfriend" and also "best friends" but explained that they were now "separated as friends." She described Pace as a "very quiet," "very kind, very supportive, very loving," and polite person who would give up his seat for someone else on the bus. Ms. Todd also said that Pace always encouraged her to continue her education even though he dropped out of school early and didn't read well. Pace was never disrespectful, violent, or hateful toward her. Ms. Todd asked the jury to have mercy on Pace because of how painful it would be for her and Pace's family to lose him.

Joe Beasley testified that he was the human resource director for the Antioch Baptist Church North. The church had a congregation of about 7,000 people, a third of whom came from the Vine City area where most of the murders took place. Mr. Beasley said that the members of his congregation and local community opposed the death penalty because it was "an African American community, poor community, and we know how the death penalty has been used." He also said that the death penalty "runs counter to Christian values." For these reasons, Mr. Beasley thought that "most people" in the Vine City community were "opposed" to executing Pace.

Pace's older sister Gwendolyn said that Pace had always been a "real important part of [her] life." Gwendolyn shared pictures of Pace's family with the jury, including pictures of Pace with her children. She asked the jury to have mercy on Pace because he was almost like a son to her.

Pace's sister-in-law Penny testified that her uncle had been shot in the head during a robbery and that her family opposed sentencing her uncle's murderer to death. Penny's family thought that a death sentence would be an "easy way out" for her uncle's murderer and that it wouldn't bring her uncle back. Penny asked the jury to have mercy on Pace, noting that if he was found innocent after his execution then there would be no way to bring him back.

Finally, Pace's mother "beg[ged]" the jury to have mercy on Pace so that she could "at least . . . talk to him sometimes." She

said that if he were to be sentenced to death, "part of [her would] be gone."

<u>The prosecutor's closing argument</u>

Before closing arguments, Pace's trial counsel objected to a cartoon that the prosecutor intended to display to the jury during its closing argument. The cartoon depicted a jury returning a verdict of "not guilty by virtue of insanity, ethnic rage, sexual abuse and you name it." Pace's trial counsel argued that the cartoon was inappropriate because it "interject[ed]" racial issues and "social status" into the case, "talk[ed] about insanity when that is not an issue in this case," and because "allow[ing] a cartoon to be used as a factor" during the sentencing phase of a death penalty trial was "inappropriate, totally." The prosecutor responded that he intended to use the cartoon to rebut Pace's mitigation defense that he was "born in the ghetto or the poor side of town and growing up under those conditions" and to rebut Mr. Beasley's testimony about "racial discrimination in terms of seeking the death penalty." The state trial court overruled the objection.

Seven parts of the prosecutor's closing argument are relevant to Pace's appeal. First, the prosecutor compared Pace to infamous serial killers Jeffrey Dahmer, Ted Bundy, and John Wayne Gacy. The prosecutor said that, like Pace's family, those serial killers' families would have also "come to court and t[old] you good things about [them] when [they] were growing up." The prosecutor emphasized that the juries in those cases still "gave [them]

justice for what [they] did." Pace's trial counsel immediately moved for a mistrial or a curative instruction. The state trial court denied the motion for a mistrial and instead instructed the jury that they "should not concern [them]selves with the verdicts in those other cases" because "[the prosecutor's] point was about the family of those particular individuals and how we might imagine they would come to court and testify."

Second, the prosecutor showed the jury the cartoon. The prosecutor read what the cartoon said about "find[ing] the defendant not guilty by virtue of insanity, ethnic rage, sexual abuse, and you name it," and argued "that's basically what [Pace was] trying to tell you when he talk[ed] about his upbringing[;] [t]hat it[ was] everybody else's fault that he turned into a serial killer but his own."

Third, the prosecutor invited the jury to "come with [him] to th[e] scene of the crime," "imagine that night" and to "imagine what Ms. McAfee thought and felt" as she was "being strangled before [she] los[t] consciousness." The prosecutor asked the jury to "come with [him] again" to the scene of Ms. McClendon's murder and to ask themselves "how would you feel in Ms. McClendon's situation . . . to wake up with some man standing up over you choking the life out of you and pulling on your clothes." And the prosecutor asked the jury to "come with [him]" to the scenes of Ms. Martin's and Ms. Britt's murders and to ask themselves "what do you think went through [Ms. Martin's] mind as she was brutally awakened with someone choking the life out of her?" and to

"imagine [Ms. Britt's] frame of mind as she fought for her life for the few minutes that she was trying to preserve her life."

Fourth, the prosecutor asked the jury if "sending [Pace] to prison would be punishment" when he would "g[et] free room and board, color TV." The prosecutor asserted: "[i]f anal sodomy is your thing, prison isn't a bad place to be."

Fifth, the prosecutor told the jury that they were "the conscience of the community" because they "decide[d] what standards of right and wrong [were] allowed in this community." The prosecutor said that the jury needed to "send a message" by sentencing Pace to death because the jury would otherwise be "saying that these victims' lives didn't matter." Pace's trial counsel moved for a mistrial based on this portion of the prosecutor's closing argument, but the state trial court denied the motion.

Sixth, the prosecutor noted Pace's "remorseless, soulless" demeanor in the courtroom and "ask[ed] [the jury] to think back to . . . [w]hen Jesus was put on the cross." The prosecutor told the jury that "there were two thieves with [Jesus]": one of the thieves "said to Jesus, in essence, Lord, remember me when you come into your kingdom," while the other thief "never repented." The prosecutor said that "Jesus forgave" the thief that repented but that the unrepentant thief "wasn't taken into Jesus' kingdom" and that the prosecutor "d[id]n't know where [that thief] went." The prosecutor said that "[Pace], too, ha[d] never repented" and "hadn't said one time I'm sorry." Pace's trial counsel objected and moved for a mistrial because the prosecutor had "impermissibl[y] comment[ed]

on [Pace's] right to remain silent." The state trial court "th[ought] it[ was] very close to the line, but . . . d[id]n't find that it" crossed the line and denied the motion. The state trial court said it would give curative instructions, but neither Pace's trial counsel nor the state trial court could "think of any" to give.

Finally, the prosecutor took out a "Georgia law book," which he told the jury "ha[d] the punishments and the crimes in it." The prosecutor argued that, "[i]f based on the evidence in this case you don't return a death penalty verdict, you have snatched that section of the book about the death penalty out." Pace's trial counsel objected because "[t]he law provide[d] for very specific reasons how and why the death penalty should or should not be imposed" and "the court will charge the jury on that." Before the trial court could rule on the objection, the prosecutor told the jury that his "point to [them was] simply this[:] [i]f your verdict is anything other than death, what we need to do is take this book" and simulated tearing out a section from the book.

### Mr. Mears's closing argument

In his closing argument, Mr. Mears "begg[ed] for the life of Lyndon Fitzgerald Pace." Mr. Mears "remind[ed] [the jury], as best [he] c[ould], that whatever [they] d[id] to [Pace], whatever [they] d[id] to this man [was] going to stay with [them] for the rest of [their] li[ves]." Mr. Mears said that he was "arguing for mercy in this case" and for the jury "to inspect [their] own feelings before [they] ma[d]e this decision."

Mr. Mears explained that "we didn't come in here and say [Pace was] insane" or "try to insult your intelligence by putting up witnesses to say that [Pace] had a deprived family." Instead, he argued, "[w]e did just the opposite" because "it would have been hypocritical for us to argue as we did and strongly . . . that the evidence didn't prove him . . . guilty" and then "come and say, well, you found him [guilty] . . . but he is crazy anyway" or that the jury shouldn't "sentence him to death because he was poor." What Pace's trial counsel had tried to do, Mr. Mears explained, was "give you the truth about as best we could as to who [Pace] was and what his family was like." And Mr. Mears said he, Mr. Harvey, and Ms. Mau did not "expect" a death sentence and reiterated that he was "telling you, [he] d[idn]'t expect it[; he was] not expecting it of you."

Mr. Mears also addressed the testimony the jury had heard from Pace's family members, asking the jury to

> understand family members when they come and they testify, and they say things, and they tell you that they don't agree with your verdict. Please don't hold that against them. That's a natural human thing. They were not arguing with you.
>
> How many of you have ever known someone who has been convicted of a crime or someone has been accused and you just say I just can't believe that because you know them? You love them. Please don't think the family members were thinking less of you

or arguing with you. They were simply expressing their sadness in the only way they knew how.

<u>The state trial court's instructions to the jury and Pace's death sentences</u>

Once the jury convicted Pace of the murders, Georgia law allowed only two sentencing options: death or life with the possibility of parole. *See Pace v. State*, 524 S.E.2d 490, 507 (Ga. 1999). If the jury sentenced Pace to life imprisonment, Pace would've served at least thirty years in prison before becoming parole eligible. *See* O.C.G.A. § 42-9-39(c). The state trial court denied Pace's pretrial motions to allow him "to question all potential jurors with regard to their . . . knowledge . . . [of] parole issues" and "to present evidence on the issue of his parole status."

During its deliberations, the jury sent a note to the state trial court that asked, "Is it possible for a life sentence to be given eliminating any possibility of parole?" The state trial court responded in writing:

> You shall not consider the question of parole. Your deliberations must be limited to whether this defendant shall be sentenced to death or whether he shall be sentenced to life in prison. You should assume that your sentence, whichever it may be, will be carried out.

Under our law, life imprisonment means that the defendant will be sentenced to incarceration for the remainder of his natural life.

The jury unanimously found nineteen statutory aggravating circumstances[2] and recommended the death penalty for each of the

---

[2] The aggravating circumstances were: (1) Pace murdered Ms. McAfee during the commission of a capital felony (rape); (2) Pace murdered Ms. McAfee during the commission of a burglary; (3) Pace murdered Ms. McAfee during the commission of an aggravated battery; (4) the murder of Ms. McAfee was outrageously or wantonly vile, horrible, or inhuman, in that it involved torture, depravity of mind, or an aggravated battery upon her; (5) the rape of Ms. McAfee was outrageously or wantonly vile, horrible, or inhuman, in that it involved torture, depravity of mind, or an aggravating battery upon her; (6) Pace murdered Ms. McClendon during the commission of a capital felony (rape); (7) Pace murdered Ms. McClendon during the commission of a burglary; (8) Pace murdered Ms. McClendon during the commission of an aggravated battery; (9) the murder of Ms. McClendon was outrageously or wantonly vile, horrible, or inhuman, in that it involved torture, depravity of mind, or an aggravated battery upon her; (10) the rape of Ms. McClendon was outrageously or wantonly vile, horrible, or inhuman, in that it involved torture, depravity of mind, or an aggravating battery upon her; (11) Pace murdered Ms. Martin during the commission of a capital felony (rape); (12) Pace murdered Ms. Martin during the commission of a burglary; (13) Pace murdered Ms. Martin during the commission of an aggravated battery; (14) the murder of Ms. Martin was outrageously or wantonly vile, horrible, or inhuman, in that it involved torture, depravity of mind, or an aggravated battery upon her; (15) the rape of Ms. Martin was outrageously or wantonly vile, horrible, or inhuman, in that it involved torture, depravity of mind, or an aggravating battery upon her; (16) Pace murdered Ms. Britt during the commission of a capital felony (rape); (17) Pace murdered Ms. Britt during the commission of a burglary; (18) the murder of Ms. Britt was outrageously or wantonly vile, horrible, or inhuman, in that it involved torture, depravity of mind, or an

four murders. The state trial court sentenced Pace to death consistent with the jury's recommendation.

### Pace's Direct Appeal

The Georgia Supreme Court affirmed Pace's convictions and death sentences on direct appeal. *See Pace*, 524 S.E.2d at 507. Three of the issues Pace raised on direct appeal are relevant here. First, Pace argued that the state trial court's admission of evidence of his prior burglary convictions, including his burglary of Coretta Scott King, violated his Eighth Amendment right to a reliable sentencing because the "convictions . . . were obtained in violation of [his] rights" because the "pleas in the [other burglary] cases were not knowingly and voluntarily entered." Second, Pace contended that the prosecutor's sentencing phase closing argument "undermined the reliability of the jury's decision at the sentencing phase." And third, Pace asserted that the state trial court violated his right to reliable sentencing by "fail[ing] to allow accurate information to go to the jury concerning [his] parole eligibility."

The Georgia Supreme Court rejected Pace's argument that the state trial court erred in admitting evidence of his prior burglary convictions. *See id.* at 505. The state trial court did not err, the Georgia Supreme Court concluded, because "[t]he [s]tate presented reliable evidence about the[] offenses and there [was] no

---

aggravated battery upon her; and (19) the rape of Ms. Britt was outrageously or wantonly vile, horrible, or inhuman, in that it involved torture, depravity of mind, or an aggravating battery upon her.

requirement that other crime evidence in the sentencing phase be proven beyond a reasonable doubt." *Id.*

The Georgia Supreme Court also rejected Pace's argument about the prosecutor's closing argument because: (1) the state trial court's curative instructions "cured any error that could result from" the prosecutor's comparison of Pace to infamous serial killers; (2) the prosecutor's use of the cartoon "did not exceed the permissible range of argument"; (3) the prosecutor's golden rule argument ("come with [him] to th[e] scene[s] of the crime" to "imagine that night") was "improper" but, "given the amount of evidence in aggravation, . . . this argument [did not] change[] the result of the sentencing phase"; (4) the prosecutor's comment that "Pace should not be spared so he could get free room and board and a television in prison [was] not improper"; (5) the prosecutor's "gratuitous remark" about anal sodomy in prison was "unprofessional," but "Pace did not object to this comment and there is no reasonable probability that this improper, isolated comment changed the result of the sentencing phase"; (6) the prosecutor's religious references "did not change the jury's exercise of discretion from life imprisonment to a death sentence"; and (7) the prosecutor's "[s]imulated tearing of a Georgia law book" was not improper because "[v]iewed in context," "the prosecutor's argument [could not] be reasonably construed as 'reading the law'" and "[i]t [was] not improper for the [s]tate to argue that [Pace] deserve[d] the harshest penalty." *Id.* at 505–07. The Georgia Supreme Court concluded that, despite the prosecutor's "several improper comments during

16-10868                Opinion of the Court                35

closing argument," Pace's death sentences "were not imposed under the influence of passion, prejudice, or any other arbitrary factor" "given the overwhelming evidence of Pace's guilt and the enormous amount of evidence in aggravation." *Id.* at 507.

Finally, because "[l]ife imprisonment without parole was not a sentencing option at Pace's trial," the Georgia Supreme Court concluded that the state trial court did not err in preventing Pace "from asking questions about parole during voir dire," "deny[ing] argument or the presentation of evidence about Pace's parole eligibility," or in responding to the jury's note about whether a sentence of life without parole was possible. *Id.* The Georgia Supreme Court determined that the state trial court's response to the jury was "appropriate" and "correct." *Id.*

### State Habeas Relief

After the Georgia Supreme Court affirmed Pace's death sentences on direct appeal, Pace petitioned for a writ of habeas corpus in state court. Pace asserted four claims that are relevant to his appeal: (1) trial counsel were ineffective for failing to investigate and present evidence of Pace's history of mental illness and his underprivileged childhood as mitigation at the sentencing phase; (2) trial counsel were ineffective for failing to object to the prosecutor's improper closing arguments at the sentencing phase; (3) the state trial court violated Pace's right to a reliable sentencing by admitting evidence that he burglarized Coretta Scott King; and (4) the state trial court violated Pace's right to a reliable sentencing by not

instructing the jury about Pace's eligibility for parole.  The state habeas court held an evidentiary hearing on December 2, 2003.

### Pace's state habeas evidence

Pace didn't present live testimony.  Instead, he submitted documentary evidence, including his prison medical records, affidavits and deposition testimony from mental health experts, his trial counsel's affidavits, deposition testimony, and case files, and more than twenty affidavits and letters from witnesses familiar with Pace's background.

### 1.  Mental health evidence

Pace's postconviction prison medical records included a March 9, 2001, psychiatric evaluation.  The record showed that the warden had requested "an immediate mental health evaluation of [Pace] because several letters had apparently been sent out indicating that he believe[d] that there [was] something going on that might lead to his harm."  Dr. Paul Beecham, a prison psychiatrist, examined Pace.  Dr. Beecham described Pace as "alert, well-oriented, calm, cooperative[,] and appropriate," showing "no indication of any agitation."  Dr. Beecham's "diagnostic impression" was that Pace had a "delusional disorder, persecutory type" but Dr. Beecham thought that "the situation w[ould] have to worsen in terms of the intensity and extent of his delusional system before [they] c[ould] intervene."

Pace submitted affidavits from Dr. Richard Dudley, a forensic psychiatrist, Dr. Paul Nestor, a neuropsychologist, and Dr.

Herendeen, the psychologist who had examined Pace before trial. Dr. Dudley examined Pace in November 2002 and March 2003, reviewed Pace's school, prison, and medical records, reviewed the other affidavits submitted on Pace's behalf to the state habeas court, and interviewed Pace's mother and his sister Jennifer. Based on his examination of Pace and his review of Pace's medical and social history, Dr. Dudley concluded that Pace "suffer[ed] from a major mental illness, [s]chizophrenia, which ha[d] been present for many years, including the time of the crimes of which he [was] convicted and during his trial on these charges." Dr. Dudley also concluded that Pace "showed clear evidence of acute symptoms of schizophrenia at the time of the offenses for which he [was] now sentenced to death." Dr. Dudley wrote that Pace "manifested symptoms" of schizophrenia when he was evaluated by Dr. Herendeen before Pace's trial.

Dr. Dudley disagreed with Dr. Beecham—the prison psychiatrist's—postconviction diagnosis of Pace as having delusional disorder. Dr. Dudley averred that "schizophrenia was the more accurate diagnosis" for "a number of reasons," including that Pace had "schizophrenic negative symptoms" and "abundant evidence of . . . positive symptoms and thought disorder not present in a delusional disorder," and "clearly show[ed] evidence of neuropsychological impairment, which almost invariably accompanie[d] schizophrenia, but not delusional disorders." In Dr. Dudley's opinion, "[t]he minimal social demands of [Pace's] current incarceration likely help[ed] to mask the profound effects that schizophrenia exert[ed]

on his judgment, behavior, and capacity to meet the ordinary demands of life."

Dr. Nestor interviewed Pace around the same time, in January 2003, and administered "intelligence and achievement tests to determine [Pace's] cognitive functioning" and "to determine whether [Pace] show[ed] signs and symptoms of schizophrenia." He also reviewed Pace's school, prison, and medical records. Dr. Nestor concluded that there was "an extremely strong, if not incontrovertible, evidentiary basis for a diagnosis of schizophrenia." Dr. Nestor noted that Dr. Herendeen's pretrial psychological testing results were "consistent with" and "fulfill[ed]" the "criteria for schizophrenia." Like Dr. Dudley, Dr. Nestor disagreed with Dr. Beecham's diagnosis of delusion disorder because Pace "clearly showed evidence of neuropsychological impairment, which invariably accompanie[d] schizophrenia, but not delusional disorders."

Dr. Herendeen wrote that Pace's state habeas counsel had told him that Pace had been "diagnosed as suffering from schizophrenia and organic brain damage" and had given him "records and affidavits recounting [Pace's] family history." According to Dr. Herendeen, "[t]hese records [were] far more comprehensive than those [he] was provided in 1995." Dr. Herendeen noted that "[t]he results of [Pace's] current neuropsychological testing showing organicity [were] consistent with [his pretrial] screening tests and what [he] reported to [Investigator] Leonard." Dr. Herendeen also "concur[red] with the diagnosis of schizophrenia and believe[d] it would have been an available and appropriate diagnosis at the time

[he] evaluated [Pace], had [he] been provided the background and historical materials on [Pace] and his family and been given the opportunity to further evaluate [Pace], as [he] recommended."

2.  Trial counsel's and Investigator Leonard's testimony

Pace submitted affidavits and deposition testimony from Mr. Mears, Ms. Mau, and Investigator Leonard.  In his affidavit, Mr. Mears explained that Ms. Mau had planned to examine Pace's mitigation witnesses during the sentencing phase of trial but she "became rattled" during her opening statement and was "unable to effectively continue."  So Mr. Mears "took over the presentation" of the sentencing phase.  Mr. Mears had met Pace's mother and "several" of Pace's siblings before trial and used Ms. Mau's interview notes during his examination.  Mr. Mears thought that Pace's mother and Ms. Todd "were productive witnesses" but that "[t]he other siblings were belligerent" and "did not give the sincere testimonials regarding [Pace's] gentle nature and good character, with heartfelt pleas for mercy, that we were [counting] on."  Mr. Mears explained that "it [was] his understanding that experts [now] believe[d Pace] was suffering from schizophrenia at the time of the crimes and was psychotic at that time" and that "if we had this information it [was] certainly something we would have considered using" as mitigation.  And Mr. Mears said that his failure to object to the "religious references" that the state made in its closing argument "was not a deliberate omission."

Mr. Mears explained that trial counsel "were attempting to present a defense that was consistent with [Pace's] plea of not

guilty" and Pace's "consistent . . . assertions that he was innocent of the charges against him." Mr. Mears said that "[t]he [s]tate's case got stronger as it went on" because "a lot of things that started off looking good insofar as being able to attack the credibility of the [s]tate's case wasn't quite as good as we thought it was or hoped it would have been by the time we got to trial." But Mr. Mears thought that "there was nothing that we had in the way of a traditional defense other than he didn't do it, and sometimes that's the only defense you have and you try to . . . convince the jurors that the [s]tate ha[d]n't proven its case beyond a reasonable doubt."

Mr. Mears also explained that it was important for trial counsel's presentation during the guilt phase to be consistent with their presentation during the sentencing phase:

> [O]nce you've raised that type of defense during the guilt/innocence phase, you have to be very careful during the sentencing phase not to do a 180-degree turn in front of the jury and say, oh, you got us, now don't sentence him to death. Because the jurors resent, in my opinion, jurors resent the defense attorneys who for two or three weeks say my client is innocent, he didn't do it, you don't have enough evidence, and then you come back in the sentencing phase, well, he did it so let's be merciful.

> You have to be consistent in the defense that you raise at guilt/innocence with the way you present mitigation. One of the ways that you do that in a not guilty, my client didn't do it, is to continue to argue residual

16-10868                Opinion of the Court                41

doubt as a possible mitigating factor, and residual doubt being, look, there might have been enough evidence beyond a reasonable doubt and you the jurors have found that, but is that enough proof to sentence this person to death.

And I think that was part of what we were doing in [Pace's] case was to try to continue the residual doubt, along with the other mitigating evidence that we attempted to present.

Mr. Mears was experienced in trying death penalty cases and estimated that "probably [eighty] percent of them . . . had some aspect of mental health as an issue for the defense." It was "common practice, in [his] opinion, in death penalty cases for counsel to have . . . a client evaluated to determine whether or not there[ were] any flags that [were] raised with regard to possible mental health issues." Mr. Mears explained that it was his decision not to present Dr. Herendeen at Pace's trial and that he "would be very reluctant to put a doctor up to say my client suffer[red] from an antisocial personality disorder" because he thought the diagnosis "tend[ed] to come across exactly as the name [was]" and would therefore not be mitigating. Mr. Mears had been aware "that [Pace] suffered from . . . severe headaches" and had heard "reports of [Pace's] drug use." But if Pace had "some underlying mental illness," Mr. Mears conceded that it was something "that [he] just missed."

Ms. Mau testified that "[Pace's] family believed strongly in [his] innocence, and it was difficult to get them focused on anything

else" during her initial interviews with them.  When Ms. Mau met with Pace's siblings a few weeks before trial, "[t]hey remained convinced [Pace] was innocent" and Ms. Mau was "concerned that despite our efforts, they would not be conciliatory before the jury." Ms. Mau also thought that Ms. Todd and Pace's mother "were the only people who gave the testimony we had envisioned" and that Pace's siblings' testimony was not "the testimony we had hoped for" because they "were defensive, and the prosecutor was able to prod them into being argumentative and unsympathetic."

As to Pace's mental health, Ms. Mau said that "Dr. Herendeen's assessment showed [Pace] to be slow but not much more," so "we did not go any further with this issue."  Ms. Mau wrote that Pace's state habeas counsel had informed her "that [Pace] ha[d] been diagnosed with schizophrenia" and explained that "we would have tried to develop and use" Pace's schizophrenia diagnosis "if this was something we had known about at the time of trial."

Investigator Leonard said that "[i]t immediately became apparent" during her interviews "that [Pace's family] had a tendency to be combative and having them testify would entail some risk." She thought that "[t]he family witnesses did not perform as we had hoped" at trial because "[t]hey argued that [Pace] could not be guilty and had in essence been framed, which allowed the [s]tate to ask pointed questions about the DNA evidence."  But she thought Ms. Todd "delivered good character evidence we requested without mentioning the problems she had with [Pace]."

As to Pace's mental health, Investigator Leonard had "been informed" by Pace's state habeas counsel that Pace had "been diagnosed as suffering from [s]chizophrenia, and that the experts believe[d] he was suffering from schizophrenia at the time of the crimes and was in fact actively psychotic then." Investigator Leonard explained that trial counsel's "preliminary evaluation of [Pace] was not directed at determining this type of mental illness" but thought that Pace's schizophrenia "would have come to light" if "further testing [had] been done by Dr. Herendeen" and that "we certainly would have considered using" Pace's schizophrenia diagnosis "[h]ad we had this information."

### 3. Testimony about Pace's background

Pace submitted affidavits from witnesses who painted a negative picture of his upbringing and mental health. The affiants included witnesses who Pace's trial counsel had interviewed during their pretrial investigation and witnesses who testified at the sentencing phase of Pace's trial. For example, Pace's older brother Darrell averred that their dad "hit" their mother "when he drank" and "got mean." Darrell thought he "was the only one who knew when we were kids that [Pace] couldn't read" because Pace "was embarrassed about it" and "asked [Darrell] not to tell anyone else." He also said that Pace started "sniffing paint" when he was ten years old.

Jennifer, Pace's younger sister, wrote that their father "was always violent with [their mom]" and that Pace "hated to see it" and "always tried to stop it." When Pace stayed with her after his

first stint in prison, Jennifer noticed that "something was wrong": Pace "would get agitated by things [she] said, and he'd get upset" and "just couldn't seem to control his reactions."

Pace's mother swore that her children "sometimes saw some of [her and Pace's father's] physical fights." She said that Pace "had a tendency to fall down a lot" and often "ended up hitting his head," including the time he "fell out of a parked car and landed on his head." She knew that Pace "really seemed not to like" school, but didn't know that Pace couldn't read or write "until he was grown."

Ms. Todd, Pace's former girlfriend, averred that she hadn't seen or heard from Pace for "a good six or seven years" before he called her "out of the blue" sometime in late 1990. She "found out very quickly that [Pace] was no longer the same person [she'd] dated the first time around." He "was much more intense than he'd been before" and "was like dealing with a child." She thought Pace "was just getting more strange each day" and "had become a man who lived in filth and didn't even notice." She described several incidents where Pace "was so incomprehensible [that she] knew something was seriously wrong with him." One night, for example, Ms. Todd came home to find "someone lying in [her] den." It turned out to be Pace. When Ms. Todd woke him up, Pace "looked terrible," "was completely incoherent," and "was moving his hands around his head . . . like he was pointing at or describing what was going on inside his head, like he was hearing something in there."

Ms. Todd remembered speaking with Ms. Mau and Investigator Leonard before Pace's trial, but said that Investigator Leonard "didn't seem to want to know anything of substance about [Pace], only 'good' anecdotes." Ms. Todd "was frustrated that [she] wasn't being allowed to tell the full story that [she] knew about [Pace]." At Pace's trial, Ms. Todd "just answered the questions that were asked of [her]" but would have testified about Pace's strange behavior "[i]f [she] had been asked."

Ms. Grissom, the teacher who Investigator Leonard interviewed before Pace's trial, also submitted an affidavit. Ms. Grissom clarified that she knew Pace "not because he was in [her] class, but because he came from a family familiar to everyone at the school." She said that Pace "was poor," "came from a family known for its neglect," lived in a bad apartment complex, and "had trouble learning." She also said that Pace had been placed in a class for children with "special education needs" but explained that "it[ was] not a great surprise that with [Pace's] history of absenteeism he never got the kind of help or attention he needed."

The affiants also included witnesses who Pace's trial counsel had not interviewed during their pretrial investigation or who had not testified during the sentencing phase of Pace's trial. For example, Jerry Johnson, a man who lived with Pace at an Atlanta boarding house in 1991, said that he and Pace were in a romantic relationship while Pace was dating Ms. Todd. Pace and Mr. Johnson hid their relationship from Ms. Todd and Pace's family. Mr. Johnson described how Pace stopped "taking care of himself" and had

to be reminded "to take a bath because he smelled so bad." Mr. Johnson said that Pace "was talking to himself all the time." After Mr. Johnson asked Pace to leave an apartment they had moved into together, someone—Mr. Johnson suspected it was Pace—"broke[] into and trashed" the apartment and vandalized his car.

Witnesses who had spent time in jail with Pace after the murders also submitted affidavits. They wrote that Pace "seem[ed] to be kind of 'nuts,'" would "talk to himself pretty constantly," "had delusions of grandeur," and "rubbed people the wrong way."

Other members of Pace's family, including Pace's father and Pace's father's former common-law wife, and members of the McDaniel family—close friends who Pace's family considered family—submitted affidavits. Pace's father swore that Pace "was always falling down and hitting his head when he was little," would "complain[] about headaches a lot," "had a bad habit of sniffing paint," and was "pretty much a loner."

Pace's father's former common-law wife, Mary Ann Hill Goree, said that she met Pace's father when he was thirty-seven years old and she was thirteen years old. When they met, Ms. Goree lived in Birmingham, Alabama, and she had "vivid memories" of Pace's father "forcibly rap[ing her] frequently when he came to town." Ms. Goree was fifteen years old when Pace's mother left Pace's father and Pace's father moved to Birmingham. Ms. Goree soon "realized [she] was pregnant by [Pace's father]." They moved in together, and Pace's father "was always rough with [her], and violent" and "continued to rape [her] on a daily basis."

16-10868                  Opinion of the Court                  47

Ms. Goree left Pace's father when she was twenty-seven years old, but Pace's father found her and attacked her, "held a knife to [her] throat," "pulled out a gun and held it to [her] head," threatened to "blow [her] brains out," and "raped [her] vaginally and anally." After Pace's father assaulted and raped her again the next day, Ms. Goree called the police and Pace's father was arrested. Ms. Goree had "only recently learned the details of" Pace's case and said that "they reminded [her] of [Pace's father]."

Members of the McDaniel family painted a negative picture of Pace's family's home life and of Pace's mental health. Marian McDaniel wrote that "[t]he places [Pace's mother] lived were places you wouldn't want your dog living in" because "[t]hey were always filthy." Sandra McDaniel said that Pace's family "never had enough to eat, and their utilities would always get cut off because [Pace's mother] hadn't paid the bills, and the places they lived were filthy, roach-infested, and cluttered, with everything thrown all over." Sandra McDaniel thought that Pace's mother "never seemed all that interested" in her children and that "those kids didn't really have any adult guidance or care." And Sandra McDaniel remembered that Pace "just looked disturbed," "kept saying that someone was after him," and "was alone all the time."

<u>The state's state habeas evidence</u>

At the evidentiary hearing in the state habeas case, the state called Mr. Johnson and Renae Shaw to testify.

### 1.  Mr. Johnson

Mr. Johnson, Pace's former roommate at the boarding house, testified for the state at the evidentiary hearing.  Mr. Johnson testified that Pace broke into his house and stole some vases even though Mr. Johnson "had burglar bars on [his] house."  He said that he and Pace would "occasionally" use crack cocaine on the weekends.

### 2.  Ms. Shaw

Ms. Shaw, a paralegal with the capital litigation section of the Georgia Attorney General's office, testified that she attended the state's interview of Mr. Johnson.  Ms. Shaw said that Mr. Johnson "stated he and also [Pace] used crack at times" and that "while [Mr. Johnson] was out of the house, [Pace] also used crack."  Ms. Shaw said that Mr. Johnson said that "[h]e just assumed that Pace was doing a lot of burglaries" because Mr. Johnson would come home to find that "Pace had all this stuff that he had gotten" but "never said where he got it from."

### The state habeas court denied Pace's habeas petition

On July 30, 2007, the state habeas court denied Pace's habeas petition.  Applying *Strickland*, the state habeas court denied Pace's claims that his trial counsel were ineffective because "[t]he decisions of [trial] counsel throughout the guilt-innocence phase and the sentencing phase were strategic and sound," "trial counsel provided more than adequate representation," and "Pace did not suffer prejudice from any alleged ineffectiveness."

As to Pace's claim that trial counsel were ineffective for failing to investigate and present evidence of Pace's history of mental illness and underprivileged childhood as mitigation at the sentencing phase, the state habeas court determined that trial counsel performed adequately in investigating and presenting mitigation evidence because: (1) their "investigation spanned a wide range of information, including Pace's mental health"; (2) they "chose the trial strategies after reasonable efforts to investigate other, alternative strategies"; (3) they "effectively utilized the available information and resources and [were] not unreasonable in choosing to present a reasonable doubt defense during the guilt-innocence phase . . . [or] in maintaining a consistent defense of residual doubt" during the sentencing phase; (4) "[b]ased on extensive research," they prepared and "called [eleven] mitigation witnesses who testified about the good character of Pace, his quiet nature, and their belief that he was innocent"; and (5) Mr. Mears's "closing argument was consistent with Pace's theory of defense."

The state habeas court also concluded that, even if ineffective, there was no reasonable probability that the mitigating evidence would have resulted in a different outcome at sentencing because: (1) neither Dr. Dudley nor Dr. Nestor "acknowledged the difficulty of conducting a retrospective evaluation spanning back to 1988, the year of the first murder" and "their findings conflict with the mental health experts at the [prison]"; (2) "[m]uch" of the habeas testimony from Pace's family and friends was "cumulative of testimony presented at trial, and all the information contained in

the affidavits was known to [trial] counsel"; (3) the affidavits Pace submitted "contain[ed] information both helpful and damaging" to Pace's mitigation case; (4) Mr. Johnson's testimony would have "seriously undermined defense counsel['s] efforts" because it "would have demonstrated Pace's deceitfulness with his girlfriend, Trina Todd," and because Mr. Johnson swore in his affidavit that Pace burglarized and vandalized his apartment, testified that Pace regularly used crack cocaine, and admitted to Ms. Shaw that he assumed that Pace burglarized other homes; and (5) "the evidence of Pace's guilt was overwhelming."

The state habeas court denied Pace's claim that trial counsel were ineffective for failing to object to the state's improper closing arguments at the sentencing phase because Pace couldn't "show prejudice." The state habeas court noted that "[t]he transcript show[ed] that [Mr.] Mears made several objections to the prosecutor's closing argument, some of which were sustained or cured with instructions." And, the state habeas court reasoned, the "Georgia Supreme Court has held that wide latitude is given to prosecutors in closing argument" and that, in affirming Pace's death sentences on direct appeal, the Georgia Supreme Court "examined the prosecutor's argument and found no reasonable probability that the alleged improprieties changed the outcome of the sentence."

The state habeas court also denied Pace's claim that the state trial court's admission of evidence that Pace burglarized Coretta Scott King violated his right to a reliable sentencing as "barred by

res judicata" because the Georgia Supreme Court "affirmed the admission of the King burglary, concluding that the [s]tate presented reliable evidence about the offenses." And Pace's claim that the state trial court's failure to instruct the jury about Pace's eligibility for parole was also "res judicata," the state habeas court concluded, because the Georgia Supreme Court "h[eld] that . . . the [state] trial court's response to the jury note regarding parole was appropriate."

The Georgia Supreme Court denied Pace's application for a certificate of probable cause to appeal the denial of habeas corpus

Pace applied to the Georgia Supreme Court for a certificate of probable cause to appeal. The Georgia Supreme Court denied Pace's application after "independently reviewing the trial record and the habeas record."

As to the state habeas court's denial of Pace's claim that his trial counsel were ineffective in investigating and presenting mitigation evidence during the sentencing phase, the Georgia Supreme Court

> conclude[d] that, while the [state] habeas court erred in some instances in considering the effect of counsel's alleged sentencing phase deficiencies on the jury's finding of guilt rather than its selection of a sentence in determining whether [Pace] ha[d] shown the necessary prejudice to constitute ineffective assistance at the sentencing phase of trial, . . . the [state] habeas court did not err in finding that [Pace] ha[d]

failed to show that counsel's sentencing phase perfor-
mance in those instances was deficient under consti-
tutional standards and there [was] no arguable merit
to [Pace's] ineffective assistance of counsel claims.

The Georgia Supreme Court summarily denied the rest of
Pace's application for a certificate of probable cause to appeal in its
entirety, stating: "[i]n light of the foregoing and upon considera-
tion of the entirety of the [a]pplication for [a] [c]ertificate of [p]rob-
able [c]ause to appeal the denial of habeas corpus, it is hereby de-
nied."

### Federal Habeas Proceedings

Pace filed a section 2254 petition for writ of habeas corpus in
the Northern District of Georgia. Five of his claims are relevant to
his appeal. First, Pace argued that the state habeas court unreason-
ably applied *Strickland* in denying his claim that trial counsel were
ineffective in investigating and presenting mitigation evidence at
the sentencing phase. Second, Pace contended that the state ha-
beas court unreasonably applied *Darden* in denying his claim that
the prosecutor's sentencing phase closing argument violated his
right to a reliable sentencing. Third, Pace asserted that the state
habeas court unreasonably applied *Strickland* in denying his claim
that trial counsel were ineffective for failing to object during the
closing argument to the state's "unconstitutional injection of reli-
gious argument in favor of the death penalty" and "unconstitu-
tional arguments that jurors should put themselves in the victim's
shoes." Fourth, Pace maintained that the state habeas court

unreasonably applied clearly established federal law in denying his claim that the state trial court's admission of evidence that he burglarized Coretta Scott King violated his right to a reliable sentencing because "Mrs. King's iconic standing . . . rendered the admission of this evidence so inflammatory and prejudicial as to violate [Pace's] constitutional rights." And fifth, Pace argued that the state habeas court unreasonably applied *Simmons* in denying his claim that the state trial court violated his right to a reliable sentencing by refusing to instruct the jury about Pace's eligibility for parole.

The district court denied Pace's section 2254 petition. First, the district court denied Pace's claim that his trial counsel were ineffective in their investigation and presentation of mitigation evidence at the sentencing phase. The district court concluded that the state habeas court reasonably determined that trial counsel's performance was reasonable because "the record demonstrate[d] that counsel and the mitigation specialist mounted an exhaustive investigation effort to uncover evidence for the sentencing phase of [Pace's] trial" and "had a psychologist interview and evaluate" Pace. The district court also concluded that the state habeas court didn't unreasonably determine that Pace wasn't prejudiced by any deficiency in trial counsel's performance because "the truly horrific nature of [Pace's] crimes overc[a]me the mitigating nature of any evidence that trial counsel could have presented."

Second, the district court denied Pace's claim that the state's improper sentencing phase closing arguments violated his right to a reliable sentencing. The district court concluded that "it [was]

evident from the [Georgia Supreme Court's] repeated conclusions that the various arguments did not change the result of the penalty phase or change the jury's direction" and that "the weight of the aggravating evidence against" Pace meant that the district court's "confidence in the outcome of the sentencing phase of [Pace's] trial [was] not shaken by the prosecution's closing argument."

Third, the district court denied Pace's claim that his trial counsel were ineffective for failing to object to the state's improper sentencing phase closing arguments. The district court concluded that Pace "failed to present argument that might tend to establish that it [was] more likely that the trial court would have granted a mistrial or that the Georgia Supreme Court would have viewed the trial court's refusal to grant a mistrial as reversible error."

Fourth, the district court denied Pace's claim that the state trial court's admission of evidence that he burglarized Coretta Scott King violated his right to a reliable sentencing, concluding that the claim was procedurally defaulted. The district court explained that Pace's claim that the state trial court's admission of evidence that Pace burglarized Coretta Scott King violated his right to a reliable sentencing "differ[ed] from the claim that he raised on [direct] appeal regarding the burglaries" because Pace's claim on direct appeal was that "the [state] trial court erred in allowing the [prior burglary] conviction[] into evidence at trial as it was not a voluntary plea based on the alleged ineffectiveness of trial counsel." Thus, the district court concluded that the state habeas court incorrectly "denied the claim as res judicata" and "should have

concluded that the claim was procedurally defaulted because [Pace] had never raised it before." And even if Pace's state appellate counsel was ineffective in failing to raise the claim on direct appeal, that would not "constitute[] cause and prejudice to lift the procedural bar," the district court explained, because "the claim [was] without merit, and . . . thus [Pace could not] demonstrate prejudice." Pace wasn't prejudiced, the district court concluded, because: (1) Pace "did, in fact, burglarize Coretta Scott King's home, and that fact [was] clearly the type of information that a sentencing tribunal should take into consideration when weighing the appropriate sentence to impose"; and (2) his "burglary of [Coretta Scott King's] home was minor" when compared to "the utter brutality and depravity" of Pace's crimes against Ms. McAfee, Ms. McClendon, Ms. Martin, and Ms. Britt.

Finally, the district court denied Pace's claim that the state trial court's refusal to inform the jury about Pace's eligibility for parole violated his constitutional rights because he "was, in fact, parole eligible, and where that [was] the case, the Constitution d[id] not require that the jury be told anything about parole."

The district court granted Pace a certificate of appealability on his claims that: (1) "trial counsel was ineffective in investigating and presenting mitigation evidence during the penalty phase"; (2) "the prosecution made improper closing argument during the penalty phase"; (3) "trial counsel was ineffective for failing to object to the prosecutor's improper closing arguments during the penalty phase"; (4) "the penalty phase of the trial was rendered unfair

because of the admission of evidence regarding the burglary of the residence of Coretta Scott King"; and (5) "the trial court erred in limiting evidence regarding [Pace's] eligibility for parole." We denied Pace's motion to expand the certificate of appealability.

## STANDARD OF REVIEW

"We review de novo the district court's denial of a 28 U.S.C. [section] 2254 petition." *Smith v. Comm'r, Ala. Dep't of Corr.*, 924 F.3d 1330, 1336 (11th Cir. 2019). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts may not grant a section 2254 petition on any claim that was adjudicated on the merits in state court unless the state court's adjudication was (1) "contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d). "[W]e must presume the state court's factual findings to be correct unless the petitioner rebuts that presumption by clear and convincing evidence." *DeBruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1266 (11th Cir. 2014) (citing 28 U.S.C. § 2254(e)(1)); *see Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287 (11th Cir. 2012) ("[O]ur review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review." (quotation omitted)).

Our focus under section 2254(d) is on the "last reasoned" state court decision. *McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252,

1261 n.12 (11th Cir. 2009). The question is not whether we believe that decision was "incorrect" but whether the decision "was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). A state court's decision is not unreasonable "so long as fairminded jurists could disagree on the correctness of the . . . decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation omitted). "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (quotation omitted). To obtain relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

## DISCUSSION

We consider only the five issues in Pace's certificate of appealability. *See Murray v. United States*, 145 F.3d 1249, 1251 (11th Cir. 1998) ("[I]n an appeal brought by an unsuccessful habeas petitioner, appellate review is limited to the issues specified in the [certificate of appealability]."). First, we explain why the Georgia Supreme Court did not unreasonably apply *Strickland* in denying Pace's claim that his trial counsel were ineffective in investigating

and presenting mitigation evidence during the sentencing phase. Second, we address why the Georgia Supreme Court did not unreasonably apply *Darden* in concluding that the state's improper sentencing phase closing arguments did not violate Pace's right to a reliable sentencing.  Third, we review why the Georgia Supreme Court did not unreasonably apply *Strickland* in denying Pace's claim that his trial counsel were ineffective for failing to object to statements the prosecutor made during the sentencing phase closing arguments.  Fourth, we discuss why the district court correctly concluded that Pace's claim that the admission of evidence that Pace burglarized Coretta Scott King violated his right to a reliable sentencing is procedurally defaulted and, even if it weren't, the claim would fail on de novo review.  And fifth, we show why the Georgia Supreme Court did not unreasonably apply *Simmons* in concluding that excluding evidence of Pace's parole eligibility did not deny Pace a reliable sentencing.

*Pace's Claim That Trial Counsel Were Ineffective in Investigating and Presenting Mitigation Evidence During the Sentencing Phase*

The Georgia Supreme Court denied Pace's claim that his trial counsel were ineffective in investigating and presenting mitigating evidence during the sentencing phase of the trial because Pace "failed to show that counsel's sentencing phase performance . . . was deficient under constitutional standards."  "In applying AEDPA, we must determine whether any fairminded jurist could agree with that assessment." *See McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1365 (11th Cir. 2021).  We conclude that

fairminded jurists could agree with the Georgia Supreme Court's application of *Strickland*.

## Strickland

Under *Strickland*, "[a] petitioner asserting a claim of ineffective assistance of counsel must demonstrate both deficient performance and prejudice—that counsel's performance 'fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Hitchcock v. Sec'y, Fla. Dep't of Corr.*, 745 F.3d 476, 485 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 687–88). "Because the failure to demonstrate either deficient performance or prejudice is dispositive of the claim against the petitioner, 'there is no reason for a court deciding an ineffective assistance claim to address both components of the inquiry if the defendant makes an insufficient showing on one.'" *Windom v. Sec'y, Dep't of Corr.*, 578 F.3d 1227, 1248 (11th Cir. 2009) (cleaned up) (quoting *Strickland*, 466 U.S. at 697).

The performance inquiry is "highly deferential," and courts must not succumb to the "all too tempting" impulse "to conclude that a particular act or omission of counsel was unreasonable" after counsel's defense "has proved unsuccessful." *Strickland*, 466 U.S. at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. "No absolute rules dictate what is reasonable performance for lawyers." *Chandler v. United States*, 218 F.3d 1305, 1317 (11th Cir. 2000) (citing

*Strickland*, 466 U.S. at 688–89).  Instead, "the performance inquiry must be whether counsel's assistance was reasonable considering *all the circumstances*."  *Strickland*, 466 U.S. at 688 (emphasis added).  In other words, if a reasonably competent attorney in counsel's shoes could—but not necessarily would—have performed the same, then the representation was adequate.  *See White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992) ("We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial."); *see also Harrington*, 562 U.S. at 110 ("*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." (quotation omitted)); *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (referring to "[a] standard of reasonableness applied as if one stood in counsel's shoes").

In reviewing a state court's determination that an attorney's performance was not unreasonable, we decide only whether the state court's conclusion about the reasonableness of counsel's performance was *itself* reasonable.  *See* 28 U.S.C. § 2254(d)(1).  We therefore give "both the state court and the defense attorney the benefit of the doubt."  *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quotation omitted).  In other words, "because the standards created by *Strickland* and [section] 2254(d) are both highly deferential," our review is "doubly" deferential "when the two apply in tandem."  *Jenkins v. Comm'r, Ala. Dep't of Corr.*, 963 F.3d 1248, 1265 (11th Cir. 2020) (cleaned up).

As to *Strickland*'s second prong, the prejudice inquiry doesn't ask whether "the errors had some conceivable effect on the outcome of the proceeding." *See Strickland*, 466 U.S. at 693. Instead, where a defendant challenges a death sentence, "the prejudice inquiry asks 'whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Hitchcock*, 745 F.3d at 485 (quoting *Strickland*, 466 U.S. at 695).

### The Georgia Supreme Court did not unreasonably apply *Strickland*'s performance prong

The Georgia Supreme Court determined that "the [state] habeas court did not err in finding that [Pace] ha[d] failed to show that [trial] counsel's sentencing phase performance . . . was deficient under constitutional standards." Pace argues that the Georgia Supreme Court unreasonably applied *Strickland*'s performance prong. He asserts that "it was per se unreasonable [for trial counsel] not to conduct a complete investigation of [Pace's] background and social history *before* deciding to rely upon doubt about guilt at sentencing." But we can't say that the Georgia Supreme Court unreasonably applied *Strickland* in affirming the state habeas court's determination that trial counsel performed a reasonable investigation that was sufficient to enable an informed decision to pursue a residual doubt defense during the sentencing phase.

### 1.  Trial counsel's investigation of mitigation evidence was reasonable

The state habeas court determined that Pace's trial counsel performed reasonably in investigating and presenting mitigating evidence because they investigated "a wide range of information, including Pace's mental health," and made "reasonable efforts to investigate other, alternative strategies."  The state habeas court's determination was not unreasonable.

### A.  Investigation of Pace's background

The state habeas court's determination that trial counsel reasonably investigated Pace's background was not unreasonable. The record shows that trial counsel hired Investigator Leonard to help investigate Pace's background and that they interviewed Pace to learn about his upbringing, history of head injuries, drug use, and academic difficulties.  Trial counsel and Investigator Leonard also met as a group with Pace's mother, his sister Lisa, his brother Garry, and Garry's wife, Penny.  At that meeting, trial counsel and Investigator Leonard "described the scope and purpose of mitigation evidence in a bifurcated trial," "emphasized that [Pace] [was] in a lot of trouble and [they] need[ed] to plan for a sentencing phase," and got names and contact information for each of Pace's siblings and "several people who kn[e]w [Pace] and the Pace family."

After the group meeting with Pace's family, trial counsel and Investigator Leonard interviewed Pace's mother, siblings, former

girlfriend, former teachers, and longtime family friends about Pace's background.  They also sought Pace's and his parents' birth certificates, medical records, school records, social security records, employment records, and criminal and civil court records. And they compiled the information from their interviews and the records they obtained into a "social history chronology" of Pace's family dating back to 1875.

In short, trial counsel's investigation of Pace's background was comprehensive and thorough.  Trial counsel hired a professional to help with the mitigation investigation, interviewed witnesses about Pace's childhood, mental health, drug and alcohol use, and potential physical abuse, and reviewed school records, medical records, employment records, criminal records, and more. "We have previously determined that an attorney performed a reasonable investigation of his client's background after the attorney performed only some of the actions that [Pace's trial counsel] performed." *See Puiatti v. Sec'y, Fla. Dep't of Corr.*, 732 F.3d 1255, 1280–81 (11th Cir. 2013) (collecting cases).  The state habeas court's determination that trial counsel performed a reasonable background investigation was not objectively unreasonable.

Pace argues that his trial counsel were constitutionally ineffective because they failed to investigate his "chaotic childhood of neglect, poverty and dysfunction, a serious head injury that went mistreated, family violence, and an environment of rampant drug use."  But trial counsel investigated what Pace and his family and friends disclosed during their interviews.  Pace's trial counsel

investigated the "serious head injury" that Pace and his mother mentioned and told Dr. Herendeen about it. Trial counsel also investigated Pace's childhood and learned from Pace's siblings that his parents "drank a little[,] argued often," and sometimes got into physical fights, and that Pace grew up in a "bad neighborhood," "dr[ank] beer like water," and "smoked a lot of weed" as a teenager.

Thus, Pace's trial counsel did investigate Pace's childhood and his history of poverty, head injuries, family violence, and drug use. Trial counsel were not ineffective for "failing to discover and develop" more powerful mitigating evidence of a chaotic childhood that Pace and his family members "d[id] not mention," *see Puiatti*, 732 F.3d at 1281 (quotation omitted); *see, e.g., Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999) (concluding that trial counsel were not ineffective for failing to find evidence of the petitioner's childhood abuse and mistreatment where the petitioner "gave [trial counsel] no reason to suspect abuse and mistreatment" and where trial counsel spoke to the petitioner's mother and "got nothing from her about [the petitioner] having been abused or mistreated"), and the records trial counsel requested did not indicate a chaotic childhood, *see Williams v. Taylor*, 529 U.S. 362, 395 (2000).

Pace also argues that trial counsel's background investigation was deficient because "they did not speak with any members of the McDaniel family," they didn't follow up with Ms. Grissom, and they "did not know about [Mr.] Johnson because they did not investigate." We disagree. As to the McDaniels family, Pace argues that, if trial counsel had interviewed them, trial counsel

"would have gotten a vastly different picture of life in the Pace household." But, as we've already explained, the state habeas court did not unreasonably conclude that trial counsel's investigation was reasonable and "spanned a wide range of information."

Trial counsel interviewed, for example, Pace and several of his family members, including Pace's mother, his sister Lisa, his brother Garry, his brother Gregory, his brother Darrell, his sister Jennifer, and his sister-in-law Penny. They also interviewed three of his former teachers and spoke to two close family friends, Ms. Booker and Ms. Turner. Based on their investigation, Pace's trial counsel later called eleven mitigation witnesses to testify on behalf of Pace at sentencing. *Strickland* required a reasonable investigation under the circumstances, and that's what trial counsel did.

Once trial counsel learned about Pace's background from his and his parents' records and their many interviews with Pace, his family, close family friends, and teachers—in other words, after they conducted a reasonable investigation under the circumstances—trial counsel were not deficient for not interviewing the McDaniels family. "The right to counsel does not require that a criminal defense attorney leave no stone unturned and no witness unpursued." *Raulerson v. Warden*, 928 F.3d 987, 997 (11th Cir. 2019) (quotation omitted) (holding that the state habeas court reasonably found that trial counsel's investigation was adequate where trial counsel interviewed the petitioner's "mother, father, brother, and an uncle" but not certain "extended family members, teachers, and acquaintances"); *see also Gissendaner v. Seaboldt*,

735 F.3d 1311, 1330 (11th Cir. 2013) ("[T]here comes a point . . . at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive of more important duties." (quotation omitted)).

As to Ms. Grissom, Investigator Leonard interviewed her. And the information about Pace's background that Investigator Leonard got from Ms. Grissom—his absenteeism, his parents' neglect, and his bad neighborhood—wasn't substantially different from what Ms. Grissom wrote in her state habeas affidavit. Trial counsel were not ineffective for not following up with Ms. Grissom because her "account [was] otherwise fairly known to defense counsel." *See Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986) (quoting *United States v. Decoster*, 624 F.2d 196, 209 (D.C. Cir. 1976) (en banc)). And, after interviewing Ms. Grissom, Investigator Leonard wasn't sure that she remembered Pace—he had never been in her class—and thought that she may have "simply remember[ed] a composite of the many kids like him at her school, which ha[d] a high population of poor kids." Based on Investigator Leonard's doubts about Ms. Grissom's memory of Pace, it wasn't unreasonable for trial counsel to direct their limited time and investigative resources elsewhere. *See Rogers v. Zant*, 13 F.3d 384, 387 (11th Cir. 1994) (explaining "the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources").

And Pace doesn't explain how trial counsel could have reasonably been expected to find out about Mr. Johnson during their

investigation. Pace never told them about Mr. Johnson, and Mr. Johnson explained that he and Pace hid their relationship from Ms. Todd and Pace's family. *Strickland* does not require Pace's trial counsel to "scour the globe on the off chance" they'd come across Pace's secret romantic partner. *See Everett v. Sec'y, Fla. Dep't of Corr.*, 779 F.3d 1212, 1249–50 (11th Cir. 2015) ("[A] defense attorney preparing for the sentencing phase of a capital trial is not required 'to scour the globe on the off chance something will turn up.'" (quoting *Rompilla*, 545 U.S. at 383)).

"The question under *Strickland* is whether [Pace's] trial counsel conducted an adequate background investigation or reasonably decided to end the background investigation when they did." *See Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1351 (11th Cir. 2011) (cleaned up). The record shows that trial counsel conducted a thorough background investigation. Contrary to Pace's contentions, "[t]his is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face." *See Bobby v. Van Hook*, 558 U.S. 4, 11 (2009). "Given the many witnesses trial counsel or [Investigator Leonard] interviewed, the mere fact that additional family and social history witnesses have now been discovered does not make trial . . . counsel ineffective." *See DeYoung v. Schofield*, 609 F.3d 1260, 1288 (11th Cir. 2010). Under our "doubly" deferential standard of review, the Georgia Supreme Court did not unreasonably conclude that Pace's trial counsel's performance in investigating mitigation

evidence was reasonable under the circumstances. *See Jenkins*, 963 F.3d at 1265 (quotation omitted).

### B. Investigation of Pace's mental health

A fairminded jurist could also agree with the state habeas court's assessment that trial counsel's investigation into Pace's mental health was reasonable. Trial counsel interviewed Pace along with his family, friends, and teachers, and questioned them about Pace's mental health. Trial counsel also sought Pace's medical and school records. After learning about Pace's head injuries and academic difficulties, trial counsel retained Dr. Herendeen to screen Pace for intellectual disability and "organic brain damage." Investigator Leonard prepared Pace for the evaluation; told Dr. Herendeen about Pace's history of head injuries, severe headaches, and poor academic performance; and gave Dr. Herendeen both the memoranda she had prepared from her interviews of Pace and his family and the social history chronology of Pace's family that trial counsel had prepared.

The state habeas court did not unreasonably apply clearly established federal law in concluding that this investigation into Pace's mental health was sufficient. We've held as much when faced with similar—or less extensive—mental health investigations. *See, e.g., Gissendaner*, 735 F.3d at 1331 ("The state habeas court's finding of no deficient performance was also reasonable with respect to trial counsel's mental health investigation, which included obtaining [the petitioner's] mental health records and consulting with [a mental health expert]."); *Reed v. Sec'y, Fla.*

*Dep't of Corr.*, 593 F.3d 1217, 1241 (11th Cir. 2010) (concluding that the state habeas court reasonably found no deficient performance where trial counsel "obtained considerable potential mitigation evidence," "had a thorough [mental health] evaluation of [the petitioner] conducted," and gave the mental health expert "a significant quantity of hospital and medical records"); *Callahan v. Campbell*, 427 F.3d 897, 934 (11th Cir. 2005) (explaining that, when a defendant "does not display strong evidence of mental problems," trial counsel is not even "required to seek an independent [mental health] evaluation" (quoting *Holladay v. Haley*, 209 F.3d 1243, 1250 (11th Cir. 2000))).

Against this, Pace argues that trial counsel unreasonably ended their investigation into his mental health when they did. Dr. Herendeen's evaluation showed that Pace had "borderline intelligence and organic brain damage," that his "paranoia scale" was "significant[ly] elevat[ed]," that his mania scale was "markedly elevated" with "feelings of grandiosity which could reach the level of delusional belief," that his schizophrenia scale was "somewhat elevated," but that Pace's IQ score wasn't "promising" for a mental disability defense. Dr. Herendeen told Investigator Leonard that Pace's results "indicated further evaluation should be pursued." Pace argues that trial counsel were ineffective because they decided not to conduct a further evaluation.

Pace is right that, "[i]n evaluating the reasonableness of counsel's investigation, courts must consider both the quantum of evidence already known to counsel and whether that evidence

would lead a reasonable attorney to investigate further." *Gissendaner*, 735 F.3d at 1323 (quotation omitted). The question, in other words, is "whether the known evidence would lead a reasonable attorney to investigate further." *Powell v. Allen*, 602 F.3d 1263, 1273 (11th Cir. 2010) (quoting *Wiggins v. Smith*, 539 U.S. 510, 527 (2003)). In assessing this question, however, courts must keep in mind that "counsel's duty to investigate does not necessarily require counsel to investigate every evidentiary lead." *Raheem v. GDCP Warden*, 995 F.3d 895, 909 (11th Cir. 2021) (quotation omitted). We must also afford a "heavy measure of deference to counsel's judgments," mindful of the "reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Williams*, 185 F.3d at 1236–37 (quotation omitted).

We can't say that the state habeas court's conclusion that trial counsel reasonably investigated Pace's mental health was contrary to or an unreasonable application of clearly established federal law. First, the state habeas court was not unreasonable in concluding that trial counsel already had enough information from their investigation to make a reasonable call not to pursue a mental health defense. While trial counsel "must gather enough knowledge of the potential mitigation evidence to arrive at an informed judgment in making that decision," *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995) (quotation omitted), Pace "has not . . . shown that there was more [that trial counsel] needed to know from a further mental evaluation" before making an informed

16-10868　　　　　　Opinion of the Court　　　　　　71

decision about their trial strategy. *Wood v. Allen*, 542 F.3d 1281, 1308 (11th Cir. 2008), *aff'd*, 558 U.S. 290 (2010).

After conducting interviews, obtaining Pace's records, and putting together a family history, trial counsel obtained a report from Dr. Herendeen. That report explained that Pace had "borderline intelligence and organic brain damage," that his "paranoia scale" was "significant[ly] elevat[ed]," that his mania scale was "markedly elevated" with "feelings of grandiosity," and that his schizophrenia scale was "somewhat elevated." Pace now presents evidence—consistent with Dr. Herendeen's findings—that two doctors have since diagnosed him with schizophrenia. But Pace's trial counsel already had information that his schizophrenia scale was elevated. They were already aware that Pace may have had borderline intelligence and organic brain damage, and they knew that there were signs of paranoia, grandiosity, and schizophrenia.

Pace's trial counsel had this information and chose to pursue a different strategy. Pace has failed to show that there was further information that trial counsel failed to discover that rendered their investigation unreasonable. *See Haliburton v. Sec'y for Dep't of Corr.*, 342 F.3d 1233, 1244 (11th Cir. 2003) ("[W]e conclude that [trial counsel] knew enough to make an informed, strategic decision not to present such mitigating evidence and that his strategic decision was reasonable."); *see also Reed*, 593 F.3d at 1242 (finding that the state habeas court reasonably found no ineffective assistance of counsel where the petitioner's post-conviction "mitigation

testimony largely just recounted, in somewhat more detailed form, the factual background that [trial counsel had] already obtained").

Second, even if the information Pace now points to was materially different from what trial counsel already knew, we can't say that the state habeas court was unreasonable in concluding that trial counsel's decision not to delve further into Pace's mental health was itself a reasonable strategic decision. "*Strickland* indicates clearly that the ineffectiveness question turns on whether the decision not to make a particular investigation was reasonable." *Rogers*, 13 F.3d at 387. And "[b]y its nature, 'strategy' can include a decision not to investigate." *Id.* Attorneys can also make "reasonable decision[s] that make[] particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

Here, trial counsel explained that they "d[idn]'t expect [Pace] to do well on any personality test" and knew that Pace's personality test results could be used against him as "a sensationalizing blunt instrument of the state." So trial counsel took a "measured approach to psychological testing" because it made "little sense" for Dr. Herendeen to give Pace tests that they'd have to "rebut in an attempt to rehabilitate [their] client." As Mr. Mears explained, he'd be "very reluctant to put a doctor up to say my client suffers from an antisocial personality disorder" because the diagnosis "tends to come across exactly as the name is." We've said the same thing. *See Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1332 (11th Cir. 2013) (explaining that "antisocial personality disorder . . . is a

trait most jurors tend to look disfavorably upon, that is not mitigating but damaging").

Beyond their strategic decision to avoid evidence that may have been aggravating, not mitigating, Mr. Mears also explained that trial counsel "were attempting to present a defense that was consistent with [Pace's] plea of not guilty." Trial counsel were wary of "do[ing] a 180-degree turn in front of the jury" and shifting from their innocence defense. After completing a thorough investigation into the defenses they could raise at sentencing, trial counsel still felt that this was the best strategy. We can't say that the state habeas court's conclusion that trial counsel reasonably decided not to obtain further mental health evaluations was contrary to or an unreasonable application of clearly established federal law. *See Ward v. Hall*, 592 F.3d 1144, 1170 (11th Cir. 2010) ("Creating lingering or residual doubt over a defendant's guilt is not only a reasonable strategy, but is perhaps the most effective strategy to employ at sentencing." (cleaned up)).

Pace analogizes this case to *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011), where we concluded that the mental health investigation fell below *Strickland*'s standards. But there's simply no comparison. In *Ferrell*, the petitioner had "obvious mental disabilities" and suffered a seizure "during the trial itself," which "caus[ed] him to fall onto the floor, shake[,] and speak gibberish." *Id.* at 1228. The petitioner's first lawyer "strongly suspected that [the petitioner] suffered from mental health problems that were 'overt and fairly apparent to anyone who cared to look closely.'" *Id.* at 1227–

28.  Trial counsel hired an investigator who also believed that the petitioner "had some kind of mental disorder" partly because the petitioner "had a strange demeanor at trial, laughing and smiling inappropriately throughout the proceedings." *Id.* at 1228.  But despite these "obvious indicators that should have led counsel to pursue a more comprehensive mental health investigation," trial counsel:  (1) did not "ask any of [the petitioner's] family . . . about any topics related to [the petitioner's] mental health"; (2) did not ask their mental health expert "to look for evidence of brain damage" and instead limited their mental health expert's inquiry to whether the defendant was "mentally retarded" or "suffered from any problems that may have affected his . . . ability to understand his constitutional rights"; and (3) "provided *no* material" to the mental health expert "other than school records." *Id.* at 1227–28.

Our case is different.  Unlike trial counsel in *Ferrell*, there's no evidence that, during trial counsel's investigation, Pace exhibited mental health issues that were "overt and fairly apparent to anyone who cared to look closely." *See id.* at 1228.  The opposite is true:  trial counsel's interviews with Pace, his family, and his former girlfriend didn't suggest that there were significant mental health issues worth pursuing.  Investigator Leonard, for example, described Pace as "pleasant, cooperative[,] and attentive throughout" her initial interview with him.  Ms. Todd told trial counsel that she dated Pace "during the time some of the[] killings occurred" and that she "never saw any indication that anything was

wrong." And Pace's brother Garry said that he had "never seen any abnormal behavior in [Pace]."

Even in the face of little evidence of mental health issues, Pace's trial counsel did all of the things trial counsel didn't do in *Ferrell*. Unlike trial counsel in *Ferrell*, for example, Pace's trial counsel questioned Pace and his family members about his mental health; asked Dr. Herendeen to evaluate Pace for brain damage; and gave Dr. Herendeen information about Pace's history of head injuries, severe headaches, and poor academic performance, memoranda from interviews of Pace and his family, and the 120-year social history chronology of Pace's family that trial counsel had prepared. *Ferrell* doesn't support Pace's claim.

2. Trial counsel's mitigation presentation was reasonable

The state habeas court determined that trial counsel "effectively utilized the available information and resources and [were] not unreasonable in choosing to present a reasonable doubt defense during the guilt-innocence phase . . . [or] in maintaining a consistent defense of residual doubt" during the sentencing phase. The state habeas court's determination was not unreasonable because "[i]t is especially difficult to succeed with an ineffective assistance claim questioning the strategic decisions of trial counsel who were informed of the available evidence." *Nance v. Warden, Ga. Diagnostic Prison*, 922 F.3d 1298, 1302 (11th Cir. 2019). Trial counsel's thorough investigation of Pace's background and mental health means that their strategic choice to pursue a residual doubt

defense is "virtually unchallengeable." *See id.* (quoting *Strickland*, 466 U.S. at 690).

### A.  Residual doubt

Pace's trial counsel made a strategic decision to present a "residual doubt" defense at sentencing and to show that Pace's family was "pleading for mercy."  As Mr. Mears explained, trial counsel "were attempting to present a defense that was consistent with [Pace's] plea of not guilty" and Pace's "consistent . . . assertions that he was innocent of the charges against him."  Trial counsel recognized that "there was nothing that [they] had in the way of a traditional defense other than he didn't do it, and sometimes that's the only defense you have."  Because Pace denied his guilt, residual doubt was a reasonable strategy. *See Parker v. Sec'y for Dep't of Corr.*, 331 F.3d 764, 787–88 (11th Cir. 2003); *Hannon v. Sec'y, Dep't of Corr.*, 562 F.3d 1146, 1154 (11th Cir. 2009) ("We have noted in our circuit that this lingering doubt or residual doubt theory is very effective in some cases.").

Mr. Mears recognized that he'd lose credibility with the jury if he wasn't "very careful during the sentencing phase not to do a 180-degree turn" after maintaining Pace's innocence during the guilt phase.  As he explained:

> [J]urors resent the defense attorneys who for two or
> three weeks say my client is innocent, he didn't do it,
> you don't have enough evidence, and then you come
> back in the sentencing phase, well, he did it so let's be
> merciful.

> You have to be consistent in the defense that you raise at guilt/innocence with the way you present mitigation. One of the ways that you do that in a not guilty, my client didn't do it, is to continue to argue residual doubt as a possible mitigating factor . . . .
>
> And I think that was part of what we were doing in [Pace's] case was to try to continue the residual doubt, along with the other mitigating evidence that we attempted to present.

Trial counsel could've undermined their efforts to get Pace a life sentence if they pulled "a 180-degree turn" at sentencing by blaming his crimes on his mental health or troubled background. *See Franks v. GDCP Warden*, 975 F.3d 1165, 1184 (11th Cir. 2020) ("[E]vidence of [the petitioner's] drug use, difficult childhood[,] and learning disability, in addition to being weak mitigating evidence, may have eroded any residual doubt if trial counsel had focused on those issues." (quotation omitted)); *Brooks v. Comm'r, Ala. Dep't of Corr.*, 719 F.3d 1292, 1304 (11th Cir. 2013) ("While an intoxication-mitigation strategy attempts to lessen the defendant's culpability for an act he concededly committed, a residual-doubt strategy depends on the defendant maintaining his innocence. That [petitioner's] intoxication evidence could have blunted the force of his residual-doubt argument is merely another way in which the new mitigating evidence could have hurt [the petitioner] as easily as it could have helped him.").

Pace argues that trial counsel's decision to pursue a residual doubt mitigation defense at sentencing was "[n]ot a strategy but a post hoc justification for failing to present mitigating evidence" because trial counsel were "not aware of the evidence that might have been available upon further investigation, so they could not make a reasonable strategic choice not to present it." But Mr. Mears testified that trial counsel's decision to present a residual doubt defense was a strategic one, and, for the reasons we've already explained, trial counsel's investigation of Pace's background and mental health was sufficient to allow them to make an informed decision to present a residual doubt defense during the sentencing phase. Trial counsel hired an investigator; talked with Pace, his family, his friends, his neighbors, and his teachers; got his school and medical records; put together a 120-year family social history; shared all of this information with a mental health expert; and received a comprehensive report from the expert. Trial counsel, in other words, "investigated different lines of mitigation and then made a strategic choice to employ residual doubt and family plea for mercy approaches in the penalty phase." *DeYoung*, 609 F.3d at 1286. The state habeas court did not unreasonably conclude that, in doing so, trial counsel's "choices, and their investigation, fell well within 'the wide range of professionally competent assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 690).

Pace asserts that trial counsel's residual doubt strategy was unreasonable considering the "overwhelming evidence of guilt" in the form of DNA evidence. But "overwhelming evidence" of a

"brutal and aggravated" crime doesn't make a residual doubt defense an unreasonable strategy. *See Franks*, 975 F.3d at 1177 (noting that "the brutal and aggravated nature of [the petitioner's] crime . . . could [have led] a reasonable attorney to conclude that without residual doubt, a life sentence would [have] be[en] difficult to sustain," even where there was "overwhelming evidence of [the petitioner's] guilt"); *Stewart*, 877 F.2d at 855–56 (concluding that trial counsel was not ineffective for adopting a "lingering doubt" strategy where "[t]he physical evidence available to the state . . . was overwhelming" and the petitioner "confessed to police"). And it was not uncommon at the time of Pace's trial for defendants to challenge the reliability of the procedures used by the government to match DNA. *See, e.g.*, *United States v. Bonds*, 12 F.3d 540, 558 (6th Cir. 1993) (addressing the defendants' challenge to the scientific validity of forensic DNA evidence). Indeed, Pace continued to challenge the reliability of the state's DNA evidence in his state habeas petition. Pace's "[t]rial counsel cannot be faulted for attempting to make the best of a bad situation." *See Stewart*, 877 F.2d at 856.

### B. *Presentation of witnesses*

The state habeas court determined that trial counsel's mitigation presentation of a residual doubt defense was reasonable because, "[b]ased on extensive research, [trial] counsel called [eleven] mitigation witnesses who testified about the good character of Pace, his quiet nature, and their belief that he was innocent" and "[trial] [c]ounsel spoke to each witness prior to taking the stand to

explain the purpose of mitigation testimony." The state habeas court's determination was not unreasonable.

Before trial, trial counsel met with Pace's family, Ms. Booker, Ms. Turner, and Ms. Todd to discuss their testimony. During one meeting with Pace's mother, sister Lisa, brother Garry, and sister-in-law Penny, Ms. Mau "described the scope and purpose of mitigation evidence in a bifurcated trial." Trial counsel also met with Pace's siblings again a few weeks before trial to discuss their testimony.

At the sentencing phase, the witnesses testified about Pace's good character and their disbelief that Pace was capable of committing the crimes and asked the jury to have mercy on Pace. Ms. Booker told the jury that Pace had "a real big impact" in motivating her grandson to stay in school and out of jail, and she and Ms. Turner testified that Pace was "very loving," "a good kid," and an "easy" and "caring" person who wouldn't harm anyone. Pace's brother Darrell told the jury about how Pace saved him from drowning. Pace's brother Gregory testified that Pace "g[a]ve respect to" and "care[d] for" the elderly by running errands for them and keeping them company. And Ms. Todd told the jury about how Pace encouraged her to continue her education despite his academic difficulties and described him as a "very quiet," "very kind, very supportive, very loving," and polite person who would give up his seat for someone else on the bus. "All of this good character evidence supported residual doubt: [Pace] had never been known to be violent and each account of his decency was designed to sow

more doubt in the jurors' minds" that Pace was capable of murder. *See Franks*, 975 F.3d at 1174.

Pace contends that it was unreasonable for his trial counsel to "focus upon residual doubt at sentencing" to the exclusion of presenting Dr. Herendeen's findings about his organic brain damage and borderline intellectual functioning and evidence of his impoverished and neglected upbringing.  According to Pace, "[n]one of the information regarding [his] mental health or his background would have been inconsistent with a penalty phase strategy of residual doubt."  But trial counsel presented evidence of Pace's troubled upbringing and borderline intellectual functioning:  Garry testified that he and Pace lived in housing projects, moved around a lot, and grew up poor, Mr. Beasley testified that the Vine City area was a "very poor" community, and Ms. Todd told the jury that Pace dropped out of school and struggled to read. Indeed, in responding to Pace's trial counsel's objection to his use of the cartoon in his closing argument, the prosecutor argued that it would be used to rebut Pace's mitigation defense that he was "born in the ghetto or the poor side of town and growing up under those conditions."

The state habeas court did not unreasonably determine that trial counsel made a reasonable strategic decision not to place more focus on Pace's background and mental health at the risk of losing credibility with the jury.  The decision not to call Dr. Herendeen at sentencing because it would be an abrupt "180-degree turn in front of the jury" "is the epitome of a strategic decision" that we will not

"second guess." *See Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess."); *DeYoung*, 609 F.3d at 1289 (rejecting the petitioner's "improper attempt to second-guess a reasonable strategic choice of trial counsel"). And trial counsel could have reasonably decided to limit their presentation of mitigating evidence about Pace's background based on their concern that the jury would share Pace's brother Garry's belief that "[j]ust because you're raised in that neighborhood doesn't mean you'll be a hoodlum." *See Blankenship v. Hall*, 542 F.3d 1253, 1280 (11th Cir. 2008) ("In this case, counsel was faced with a brutal rape and murder of an elderly woman. In light of the gruesome facts, . . . reasonably competent counsel could have decided the best chance for sparing [the petitioner's] life was to convince the jury some residual doubt existed. Counsel could have concluded the inclusion of extensive mitigating evidence addressing [the petitioner's] life history might cloud the jury from focusing on the question of residual doubt, or would simply have been unpersuasive in light of the gruesome nature of the crime.").

Pace also argues that his trial counsel's sentencing phase presentation of witnesses was "affirmatively aggravating" for two reasons. First, Pace argues that Ms. Booker's and Ms. Turner's descriptions of Pace as a child and teenager were not mitigating because both women conceded that they only knew Pace during his childhood and teenage years. Second, his family members'

testimony was aggravating, Pace says, because they testified that he was "normal," "could point to almost no examples of good character to bolster their beliefs that [Pace] was innocent," and "blind[ly] insiste[d] that [Pace] had been framed."

Pace's focus on Ms. Booker's and Ms. Turner's testimony ignores that trial counsel also called Ms. Todd, who Pace concedes "gave the most mitigating evidence" by testifying about Pace's support as she pursued a college education despite his difficulty reading. But even putting Ms. Todd's testimony aside, we can't say that the state habeas court unreasonably determined that trial counsel performed reasonably by calling Ms. Booker and Ms. Turner—two longtime friends of Pace's family—to "relay[] anecdotes of [Pace's] helpfulness" and to testify about "his quiet nature, and their belief that he was innocent." And contrary to Pace's assertion that Ms. Booker didn't testify about more recent examples of Pace's good character, she testified about Pace's helpfulness during his adulthood, when he had a "real big impact" in motivating her grandson to stay in school by telling her grandson about life in jail.

The same is true of Pace's family members' testimony. Pace's siblings described him as an "easy-going, quiet person" who "g[a]ve respect to his elders," helped elderly neighbors, and who had even saved his brother from drowning. And his family insisted that Pace's crimes went against his character. This presentation of "good character evidence supported residual doubt." *See Franks*, 975 F.3d at 1174.

Although Pace's family members' testimony wasn't as help-
ful as trial counsel "were planning on," we are not permitted "to
second-guess an attorney with the benefit of our hindsight." *Jen-
kins*, 963 F.3d at 1270.  While trial counsel knew from their inter-
views that Pace's family members "had a tendency to be combative
and having them testify would entail some risk," trial counsel also
thought they had the potential to "be very good mitigation wit-
nesses."  Fairminded jurists could agree with the Georgia Supreme
Court that trial counsel reasonably decided that the potential ben-
efit of Pace's family members' testimony outweighed the risks. *See
Waters*, 46 F.3d at 1512.

## C.  Closing argument

The state habeas court determined that Mr. Mears's closing
argument "was adequate" because it "was consistent with Pace's
theory of defense."  Pace argues that Mr. Mears's closing argument
was constitutionally deficient because Mr. Mears "disavowed" any
attempt to present mitigating evidence of Pace's troubled back-
ground, "essentially threw away any residual doubt argument" by
asking the jury to understand that Pace's family members weren't
arguing with the verdict by insisting on Pace's innocence, and
"browbeat[] jurors about their value systems[] and impl[ied] that
they [were] immoral if they g[a]ve a death sentence."

Pace's criticisms of Mr. Mears's closing argument are mis-
placed.  Pace argues that Mr. Mears "disavowed" mitigating evi-
dence of Pace's background when he told the jury that he did not
"try to insult [their] intelligence by putting up witnesses to say that

[Pace] had a deprived family" because "it would have been hypocritical for us to argue as we did and strongly . . . that the evidence didn't prove him . . . guilty" and then "come and say, well, you found him [guilty]" but don't "sentence him to death because he was poor." But Mr. Mears's closing argument was consistent with his belief that he would've undermined his efforts to get Pace a life sentence by making "a 180-degree turn" at sentencing by blaming Pace's crimes on his troubled background. *See Franks*, 975 F.3d at 1184.

Nor, as Pace contends, did Mr. Mears "essentially thr[o]w away any residual doubt argument" by asking the jury to understand Pace's family members' disagreement with the jury's verdict. Mr. Mears told the jury that he "d[id]n't expect" them to impose a death sentence, reminded the jury that trial counsel had "strongly" argued "that the evidence didn't prove [Pace] . . . guilty," and explained that trial counsel had "give[n] you the truth about as best we could as to who [Pace] was and what his family was like." Mr. Mears never abandoned the residual doubt defense. *See Jenkins*, 963 F.3d at 1269 ("[A] strategy of 'focusing on obtaining an acquittal and then, at sentencing, on lingering doubt' is reasonable, even if counsel does not use the words 'lingering doubt' or 'residual doubt.'" (quoting *Chandler*, 218 F.3d at 1320 & n.6)). And trial counsel's challenges to the reliability of the state's evidence during the guilt phase from only a few days before the sentencing phase

closing arguments "would have been fresh on the minds of the jury."[3] *Id.*

Pace's reliance on *Ferrell* and the dissent in *Jefferson v. Hall*, 570 F.3d 1283 (11th Cir. 2009), *vacated by Jefferson v. Upton*, 560 U.S. 284 (2010), misses the mark. In *Ferrell*, we concluded that defense counsel's residual doubt defense "was powerfully undercut by the very nature of the closing argument defense counsel made at the penalty phase." 640 F.3d at 1231. We explained that defense counsel's statements in closing argument were not "consonant with a residual doubt claim" because defense counsel told the jury that: (1) the defendant's testimony about what happened was "'absurd,' 'hard to swallow,' 'hard to believe,' 'wild,' and 'ludicrous'"; (2) the jury had "unquestionably" already found one aggravating circumstance and could therefore "legitimately sentence [the defendant] to death"; (3) he "had the 'unpleasant duty' of arguing that two deaths 'by execution' did not warrant the death penalty"; (4) "all the circumstances pointed toward [the defendant's] guilt"; and (5) "[n]o rational jury would have found otherwise in the guilt-innocence phase because of the ludicrousness of [the defendant's] story" and noted that "[y]ou could try this case a thousand times before a thousand juries and you'd get the same result; we've all known that from day one." *Id.* at 1207, 1231–32.

---

[3] At the beginning of the sentencing phase, the state trial court instructed the jury that it was "authorized to consider . . . [what it] already heard in the guilt or innocence stage."

And in *Jefferson*, we reviewed the petitioner's habeas petition de novo because the habeas petition was filed before the effective date of AEDPA. 570 F.3d at 1300. The court concluded that trial counsel performed adequately during the sentencing phase by presenting a residual doubt defense because, among other things, trial counsel "reference[d]" their "innocence defense at the guilt phase" by "emphasizing during closing argument that there were no eye witnesses to the crime, no guilty plea, and 'no evidence of any consciousness of guilt.'" *Id.* at 1305–07. The dissent, in contrast, believed that defense counsel's closing argument was "inconsistent with a residual doubt strategy." *Id.* at 1318 (Ed Carnes, J., dissenting). The dissent explained that trial counsel's closing argument "concede[d] that [the defendant] killed the victim" and "[a] residual doubt strategy that concedes the defendant murdered the defenseless victim is not a strategy at all." *Id.* at 1318–19.

Here, unlike the trial counsel in *Ferrell*, Mr. Mears didn't concede Pace's guilt but instead told the jury that he did not "expect" them to sentence Pace to death, reminded the jury that trial counsel had "strongly" argued that Pace was innocent during the guilt phase, and explained that trial counsel had "give[n] you the truth about as best we could as to who [Pace] was and what his family was like" during the sentencing phase. Trial counsel never suggested that "the circumstances pointed toward [Pace's] guilt" or that Pace's story was "ludicrous[]." *Ferrell*, 640 F.3d at 1207, 1231–32. Instead, like trial counsel in *Jefferson*, Mr. Mears's closing argument "reference[d]," *see* 570 F.3d at 1305, Pace's "strong[]"

argument in the guilt phase "that the evidence didn't prove him . . . guilty." Mr. Mears did not, as the dissent in *Jefferson* concluded trial counsel had done, "concede[] that [Pace] had committed the murder." *See id.* at 1319 (Ed Carnes, J., dissenting). The state habeas court's determination that Mr. Mears's closing was consistent with a residual doubt defense was not unreasonable—particularly when viewed through AEDPA's "doubly" deferential lens. *See Jenkins*, 963 F.3d at 1271.

Finally, Mr. Mears's effort to ask the jury for their understanding of Pace's family members' argumentative demeanor wasn't an unreasonable strategic decision. After Pace's family members' "belligerent," "argumentative," and "unsympathetic" testimony proved not to be what trial counsel were counting on, we can't say that the Georgia Supreme Court unreasonably concluded that Mr. Mears's attempt to reestablish credibility with the jury during his closing argument was reasonable. *See Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) ("This [c]ircuit reviews a lawyer's conduct under the 'performance' prong with considerable deference, giving lawyers the benefit of the doubt for 'heat of the battle' tactical decisions."); *see also Schlager v. Washington*, 113 F.3d 763, 769 (7th Cir. 1997) ("[S]ometimes trials take unpredictable twists. To meet those twists, a plan at the start of a trial sometimes must be adjusted to meet changed circumstances. That's what happened here, and we can't say [trial counsel] made the wrong call . . . .").

*Pace's Claim That the Prosecutor's Sentencing Phase Closing Argument Violated His Right to a Reliable Sentencing*

In affirming Pace's death sentences on direct appeal, the Georgia Supreme Court concluded:

> Although the prosecutor made several improper comments during closing argument in both phases of the trial, we conclude, given the overwhelming evidence of Pace's guilt and the enormous amount of evidence in aggravation, that the death sentences in his case were not imposed under the influence of passion, prejudice, or any other arbitrary factor.

*Pace*, 524 S.E.2d at 507.  Pace contends that the prosecutor's "improper [closing] argument . . . rendered the sentencing phase fundamentally unfair."  He argues that when measured against the Supreme Court's decisions in *Darden*, *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), and *Berger v. United States*, 295 U.S. 78 (1935), the Georgia Supreme Court unreasonably concluded that the prosecutor's closing argument did not amount to a violation of due process.

The prosecutor's closing argument "deserves the condemnation it has received."  *See Darden*, 477 U.S. at 179; *Pace*, 524 S.E.2d at 505–07 (describing the prosecutor's closing argument as "improper," "gratuitous," and "unprofessional").  But the Supreme Court has instructed that it's "not enough that the prosecutors' remarks were undesirable or even universally condemned."  *See Darden*, 477 U.S. at 181 (quotation omitted).

For two reasons, none of the cases Pace has pointed to—
*Darden*, *Donnelly*, and *Berger*—clearly establish that his trial fell
short of what due process requires.  First, "it is not an unreasonable
application of clearly established [f]ederal law for a state court to
decline to apply a specific legal rule that has not been squarely es-
tablished by [the Supreme Court]."  *Reese*, 675 F.3d at 1288 (quot-
ing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).  "The Su-
preme Court has reiterated, time and again, that, in the absence of
a clear answer—that is, a holding by the Supreme Court—about an
issue of federal law, we cannot say that a decision of a state court
about that unsettled issue was an unreasonable application of
clearly established federal law."  *Id.*[4]

As in *Reese*, there's no Supreme Court holding that placed
the Georgia Supreme Court's ruling beyond fairminded debate.
There, we held that *Darden* and *Donnelly* did not clearly establish
that a prosecutor's closing argument rendered a trial unfair because
"[o]nly a holding of the Supreme Court can clearly establish federal
law" and in both cases the Supreme Court "held that the prosecu-
tor's argument . . . *did not* deprive the petitioner of a fair trial."  *Id.*
at 1289 (emphasis added).  In *Darden*, the Court held that a prose-
cutor's closing "did not deprive [the] petitioner of a fair trial" even

---

[4] Pace "would have us consider our own precedents, and those of other [c]ir-
cuits, in our analysis.  [But] [s]ection 2254(d) forbids this practice."  *See Lucas
v. Warden, Ga. Diagnostic & Classification Prison*, 771 F.3d 785, 807 n.5 (11th
Cir. 2014).

though the prosecutor called the petitioner a "vicious animal," said he should be on a "leash," and told the jury he "wish[ed]" someone had "blown [the petitioner's] head off." *Darden*, 477 U.S. at 180 n.12, 181. And, in *Donnelly*, the Court found no "denial of due process" where a prosecutor told the jury during closing that he "sincerely believe[d] that there [was] no doubt" about the petitioner's guilt and that he suspected that the petitioner stood trial not because he was innocent but because he "hope[d] that you find him guilty of something a little less than first-degree murder." *Donnelly*, 416 U.S. at 640 & n.6, 643. Our holding in *Reese* controls here: because neither *Darden* nor *Donnelly* held that a prosecutor's closing argument violated due process, we can't say that the state court's ruling here "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Reese*, 675 F.3d at 1287, 1290 (quotation omitted) (finding no unreasonable application of clearly established law where the prosecutor "compared" the defendant to a "vicious dog" and "told the jury" that the victim's experience was "every woman's wors[t] nightmare").

The Supreme Court's ruling in *Berger* doesn't help either. There, the Court did not hold that a prosecutor's closing argument deprived the petitioner of a fair trial. Rather, the Court held that the "cumulative effect" on the jury of the prosecutor's "pronounced and persistent" misconduct at trial—including "misstating the facts in his cross-examination of witnesses," "putting into the mouths of . . . witnesses things which they had not said,"

"suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered," "pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis," "assuming prejudicial facts not in evidence," "bullying and arguing with witnesses," "conducting himself in a thoroughly and indecorous and improper manner," and making "improper insinuations and assertions calculated to mislead the jury"—was so prejudicial as to warrant a new trial. *Berger*, 295 U.S. at 84–85, 89. In other words, *Berger* didn't hold that the prosecutor's closing argument alone violated due process, so the Georgia Supreme Court did not unreasonably apply that decision to the prosecutor's closing argument in this case.

In short, "the Supreme Court has never held that a prosecutor's closing arguments," in a vacuum, "were so unfair as to violate the right of a defendant to due process." *Reese*, 675 F.3d at 1287. So we can't say that the Georgia Supreme Court unreasonably determined that the prosecutor's closing argument didn't render Pace's sentencing "so unfair as to violate [his right] to due process." *Id.*; *see also Greene v. Upton*, 644 F.3d 1145, 1158–59 (11th Cir. 2011) (concluding that the Georgia Supreme Court did not unreasonably apply *Darden* in affirming the defendant's conviction and death sentence where the prosecutor's closing arguments included "comments that placed jurors in a victim's position" and "references to the Bible" because the petitioner "fail[ed] to cite any clearly established precedent from the Supreme Court of the

United States that the Supreme Court of Georgia contravened or applied unreasonably"). "[W]e cannot say that [the Georgia Supreme Court's decision] about [this] unsettled issue was an unreasonable application of clearly established federal law." *See Reese*, 675 F.3d at 1288.

Second, even if *Darden* could lead to a violation of clearly established law, the Georgia Supreme Court did not unreasonably determine that the prosecutor's closing argument did not render Pace's trial unfair. We consider the prosecution's closing argument "in the context of the entire proceeding, including . . . the weight of aggravating and mitigating factors." *See Land v. Allen*, 573 F.3d 1211, 1219–20 (11th Cir. 2009). The jury heard and saw evidence that Pace brutally raped, sodomized, and strangled to death Ms. McAfee, an eighty-six-year-old woman who Pace had known "since he was a baby." The jury heard and saw evidence that Pace brutally raped, sodomized, and strangled to death Ms. McClendon, a seventy-eight-year-old woman. The jury heard and saw evidence that Pace brutally raped, sodomized, and strangled to death Ms. Martin, a seventy-nine-year-old woman. The jury heard and saw evidence that Pace brutally raped and strangled Ms. Britt and sodomized her dead body. And the jury learned about Pace's attempts to inflict the same horrible fate on Ms. Grogan and Ms. Sublett, two elderly women who escaped only because they fought back. Based on this evidence, the jury found *nineteen* statutory aggravating circumstances.

As the Georgia Supreme Court found, the amount of evidence in aggravation was "enormous." *See Pace*, 524 S.E.2d at 507; *cf. Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644, 656 (11th Cir. 2014) (describing a murder with seven aggravating circumstances as "unquestionably one of the most aggravated murders—not just as compared to all other murders, but as compared to all death penalty cases" (quotation omitted)). The Georgia Supreme Court's due-process determination wasn't beyond fairminded disagreement given the number of aggravating circumstances that grossly outweighed the mitigating circumstances and the "heinous nature of the offense[s]." *See Ray v. Ala. Dep't of Corr.*, 809 F.3d 1202, 1210 (11th Cir. 2016) ("We find ourselves in a situation that warrants deference to the state court's determination. Though the extent of mitigating evidence presented during the post-conviction proceedings was both profound and compelling, so too was the heinous nature of the offense . . . ."); *Grayson v. Thompson*, 257 F.3d 1194, 1230 (11th Cir. 2001) ("[W]e are confident that [the petitioner's] sentence would have been the same despite the presentation of mitigating circumstances in light of the brutality of the crime against an elderly widow who had been nothing but nice to him.").

Pace argues that we shouldn't apply AEDPA deference to the Georgia Supreme Court's conclusion that the closing statement did not violate his due process rights because it "failed to apply clearly established federal law," emphasizing that the Georgia Supreme Court only cited *Donnelly* "a single time" and didn't

"mention[]" *Darden* or *Berger* in its opinion. But whether a state court "failed to apply" or "mention" established Supreme Court law is not the standard under section 2254. *See Early v. Packer*, 537 U.S. 3, 8, 10 (2002). Instead, section 2254(d)(1) imposes the "more demanding requirement" that the state court's decision be "'contrary to' clearly established Supreme Court law" before we may grant habeas relief. *See id.* at 7–8, 10. Section 2254(d)(1) does not "require citation of [the Supreme Court's] cases—indeed, it does not even require *awareness* of [the Supreme Court's] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.* at 8; *see Greene*, 644 F.3d at 1157 ("[A] decision receives AEDPA deference even if the state court fails to cite—or is not even aware of—relevant Supreme Court precedent." (quotation omitted)).

Alternatively (and somewhat inconsistently), Pace argues that the Georgia Supreme Court "unreasonably applied . . . *Darden*." More specifically, he contends that the Georgia Supreme Court "failed to analyze the cumulative effect" of the prosecutor's improper comments. But, even if *Darden* could clearly establish federal law on this point, the Georgia Supreme Court *did* analyze the cumulative effect of the prosecutor's statements. After individually considering each of the challenged statements from closing argument, the Georgia Supreme Court considered them collectively, noting that, "[a]lthough the prosecutor made *several* improper comments during closing argument . . . , we conclude, given . . . the enormous amount of evidence in aggravation, that

the death sentences in his case were not imposed under the influence of passion, prejudice, or any other arbitrary factor." *Pace*, 524 S.E.2d at 507 (emphasis added).  The Georgia Supreme Court, in other words, did consider the cumulative effect of the prosecutor's "several" statements.

Even if it weren't obvious from the face of its opinion that the Georgia Supreme Court considered the cumulative effect of the prosecutor's statements, Pace raised a claim on direct appeal about the cumulative effect of the prosecutor's improper comments, and the Georgia Supreme Court rejected it. *See Pace*, 524 S.E.2d at 507. "Although [Pace] contends that the [Georgia Supreme Court] failed even to consider his claim of cumulative prejudicial effect, we must presume otherwise." *See Greene*, 644 F.3d at 1159–60. And Pace "fails to explain how the decision of the [Georgia Supreme Court] about no cumulative error is contrary to, or an unreasonable application of, clearly established federal law." *See id.* at 1160.

### Pace's Claim That Trial Counsel Were Ineffective in Failing to Object to Improper Prosecutorial Comments

The Georgia Supreme Court summarily denied Pace's claim that trial counsel were ineffective in failing to object to the prosecutor's improper comments during closing argument.  We therefore "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "then presume that the unexplained decision adopted the same reasoning." *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The

state habeas court rejected Pace's claim that trial counsel were ineffective for failing to object to the prosecutor's improper closing arguments because it found that Pace failed to establish prejudice. Thus, we presume that the Georgia Supreme Court adopted the state habeas court's prejudice determination. *See id.*

Pace argues that "[t]rial counsel provided ineffective assistance by neglecting to object to the prosecution's [g]olden [r]ule arguments and religious references abjuring mercy." He claims that "the trial court would have granted a mistrial or, alternatively, the Georgia Supreme Court would have overturned [Pace's] convictions and sentences on direct appeal" if trial counsel had timely objected because the lack of an objection meant that "the Georgia Supreme Court applied a more rigorous standard when reviewing these claims." But this argument—that Pace's trial or appeal would've come out differently had his trial counsel objected—is unavailing.

First, Pace has not shown a reasonable probability that the state trial court would have granted a mistrial had trial counsel made a timely objection. Under Georgia law, "[w]hether to grant a mistrial for improper argument is a matter largely within the trial court's discretion. The trial court has other options, including the rebuke of counsel and providing curative instructions." *Lloyd v. State*, 625 S.E.2d 771, 776 (Ga. 2006). There is no indication in the record that the trial court would have exercised its discretion to grant a mistrial had trial counsel objected to the prosecutor's golden rule arguments and religious references. Rather, every

indication is to the contrary. When trial counsel objected to other parts of the prosecutor's closing argument, the state trial court either overruled the objection or gave curative instructions.

Second, whether the result of Pace's direct appeal would have been different does not affect our analysis under *Strickland*. *Strickland*'s prejudice prong requires a petitioner to show "a reasonable probability that the outcome *in his sentencing* would have been different but for the failure to object." *Thomas v. Att'y Gen.*, 992 F.3d 1162, 1192 (11th Cir. 2021) (emphasis added); *see Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006) ("The Supreme Court in *Strickland* told us that when the claimed error of counsel occurred at the guilt stage of a trial (instead of on appeal) we are to gauge prejudice against the outcome of the trial: whether there is a reasonable probability of a different result at trial, not on appeal."); *United States v. Chavez*, 193 F.3d 375, 379 (5th Cir. 1999) ("[C]ounsel's failure to object certainly diminished [the petitioner's] possibility of reversal on direct appeal. However, the focus here is whether a reasonable probability exists that counsel's deficient performance affected the outcome and denied [the petitioner] a fair trial."). And Pace hasn't shown that. The state habeas court did not unreasonably apply *Strickland* in finding no prejudice.

### Pace's Claim That Admission of Evidence of the Burglary of Coretta Scott King Violated His Right to a Reliable Sentencing

The state habeas court denied Pace's claim that the admission of evidence that he burglarized Coretta Scott King violated his right to a reliable sentencing, concluding that the claim was "barred

by res judicata." The district court concluded that this claim was procedurally defaulted because Pace didn't raise it on direct appeal. We agree with the district court that Pace's claim is procedurally defaulted because he did not present it to the Georgia Supreme Court on direct appeal.

"A claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Henderson v. Campbell*, 353 F.3d 880, 898–99 (11th Cir. 2003) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)); *see* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a [s]tate court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the [s]tate[.]").

To satisfy the exhaustion requirement, the federal claim "must be fairly presented to the state courts." *Picard v. Connor*, 404 U.S. 270, 275 (1971). To be "fairly presented," a petitioner must "present the state courts with the same claim he urges upon the federal courts." *Id.* at 276. The petitioner must present his claims to the state courts "such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation." *Kelly v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004). In other words, the petitioner must "afford the state courts a meaningful opportunity to consider allegations of

legal error without interference from the federal judiciary." *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (quotation omitted). "[W]hen it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief." *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998).

Pace did not exhaust his claim that the admission of evidence that he burglarized Coretta Scott King violated his right to a reliable sentencing because it is different from the issue he raised on direct appeal. "In order to preserve an issue for collateral review under Georgia law, a timely objection must be made at trial and raised on appeal in accordance with Georgia procedural rules." *Devier v. Zant*, 3 F.3d 1445, 1454 (11th Cir. 1993); *accord Waldrip v. Head*, 620 S.E.2d 829, 835 (Ga. 2005) ("Claims not raised on direct appeal are barred by procedural default[.]"). On direct appeal, Pace argued that the admission of evidence that he burglarized Coretta Scott King violated his right to a reliable sentencing because the "conviction[ was] obtained in violation of [Pace's] rights." Pace explained:

> During the sentencing phase, the state introduced into evidence the defendant's pleas of guilty and sentencing in the King and Monroe cases. At the time [Pace] entered these pleas, he was represented by a Mr. James S. Purvis. Mr. Purvis did not render effective assistance of counsel and [Pace's] pleas in the

> King and Monroe cases were not knowingly and vol-
> untarily entered. The trial court thus erred by admit-
> ting the plea and sentencing documents in those
> cases.

The Georgia Supreme Court concluded that "the admission of non-statutory aggravating evidence about several previous burglaries . . . was not error" because "[t]he [s]tate presented reliable evidence about these offenses and there [was] no requirement that other crime evidence in the sentencing phase be proven beyond a reasonable doubt." *Pace*, 524 S.E.2d at 505.

As the district court explained, and as Pace acknowledges, Pace's claim in his section 2254 petition is different from the claim that he raised on direct appeal. Pace argued on direct appeal that the admission of evidence that he burglarized Mrs. King violated his right to a reliable sentencing because his guilty plea was "not knowingly and voluntarily entered." But, in his section 2254 petition, Pace claims that the admission of evidence that he burglarized Mrs. King violated his right to a reliable sentencing because "Mrs. King's iconic standing . . . rendered the admission of this evidence so inflammatory and prejudicial as to violate [Pace's] constitutional rights." The "reasonable reader" wouldn't understand the issue Pace raised about the reliability of the evidence of his prior burglary convictions on direct appeal to have the same "particular legal basis and specific factual foundation" as Pace's claim about the evidence's prejudicial effect. *See Kelly*, 377 F.3d at 1344–45. That's why the Georgia Supreme Court ruled that "[t]he [s]tate presented

reliable evidence about these offenses" and didn't address whether the evidence was unconstitutionally prejudicial. *Pace*, 524 S.E.2d at 505.

Because the issue he raised on direct appeal—whether the reliability of his burglary conviction violated his right to a reliable sentencing—is not the "same claim" as the claim he made in his section 2254 petition—whether the evidence that Pace burglarized Mrs. King was "so inflammatory and prejudicial" as to violate Pace's right to a reliable sentencing—it was not "fairly presented" to the Georgia Supreme Court. *See Picard*, 404 U.S. at 275–76. And because he did not raise the claim on direct appeal, the Georgia Supreme Court would find it "barred by procedural default." *See Waldrip*, 620 S.E.2d at 835. Thus, Pace's claim "is procedurally defaulted for the purposes of federal habeas review." *See Henderson*, 353 F.3d at 898–99.

Although Pace's claim is procedurally defaulted, "[a] petitioner may obtain federal review of a procedurally defaulted claim if he can show both cause for the default and actual prejudice resulting from the default." *Jones v. Campbell*, 436 F.3d 1285, 1304 (11th Cir. 2006). "Additionally, in extraordinary cases, a federal court may grant a habeas petition without a showing of cause and prejudice to correct a fundamental miscarriage of justice." *Id.* But Pace "has not attempted to meet either exception" and is therefore "not entitled to relief on this claim." *See id.* at 1304–05.

Alternatively, we conclude that Pace's claim would fail even if it weren't procedurally defaulted. "As we have said many times

and as the Supreme Court has held, a federal court may skip over the procedural default analysis if a claim would fail on the merits in any event." *Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020). When we take this route, we "approach and analyze the claim de novo." *Id.*

The state trial court's admission of evidence that Pace burglarized Mrs. King did not deny Pace a reliable sentencing. "Under Georgia law, the [s]tate is permitted to prove nonstatutory aggravating circumstances, so long as it proves at least one statutory aggravating circumstance." *Devier*, 3 F.3d at 1464 n.63 (citing O.C.G.A. §§ 17-10-2, 17-10-30(b)). Here, the state proved nineteen statutory aggravating circumstances—including that Pace murdered Ms. McAfee, Ms. McClendon, Ms. Martin, and Ms. Britt during the commission of a burglary—so the jury could consider "any lawful evidence which tends to show the motive of the defendant, his lack of remorse, his general moral character, and his predisposition to commit other crimes.'" *Id.* at 1466 (cleaned up); *see also Gregg v. Georgia*, 428 U.S. 153, 203 (1976) (plurality opinion) ("We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at [the sentencing phase] and to approve open and far-ranging argument. . . . We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision."). Evidence that Pace burglarized another elderly woman tended to show, at the very least, Pace's general moral character and his predisposition to commit other crimes. Thus, there was no

constitutional error in the state trial court's admission of evidence that Pace burglarized Mrs. King.  *See Moore v. Zant*, 722 F.2d 640, 643–44 (11th Cir. 1983) (finding "no constitutional error" in the trial court's admission of evidence of nonstatutory aggravating circumstances which "included evidence of previous convictions for two unrelated burglaries").

Pace's argument that this evidence "was so inflammatory and prejudicial as to violate [his] right to a fair and reliable sentencing" fails.  "We will not grant federal habeas corpus relief based on an evidentiary ruling unless the ruling affects the fundamental fairness of the trial."  *Sims v. Singletary*, 155 F.3d 1297, 1312 (11th Cir. 1998).  "Habeas relief will only be granted if the state trial error was material as regards to a critical, highly significant factor."  *Baxter v. Thomas*, 45 F.3d 1501, 1509 (11th Cir. 1995) (cleaned up); *see Williams v. Kemp*, 846 F.2d 1276, 1281 (11th Cir. 1988) ("To constitute a denial of fundamental fairness, the evidence must have been not only erroneously admitted at trial, but also must be material in the sense of a crucial, critical, highly significant factor in the conviction." (quotation omitted)).

The evidence that Pace burglarized Mrs. King was not "a crucial, critical, highly significant factor" in the jury sentencing Pace to death.  We agree with Pace that Mrs. King "was recognized as a civil rights leader in her own right."  But we also agree with the district court that Pace's "burglary of M[r]s. King's home was minor when compared to his crimes against Lula Bell McAfee, Mattie Mae McClendon, Johnnie Mae Martin, and Annie Kate

Britt" and that Pace's contention that his burglary of Mrs. King's home "would tip the balance in a juror's mind toward execution strains credulity." In other words, Pace has not shown that his death sentences "ultimately could not have been imposed on a reasonable basis" without evidence that he burglarized Mrs. King. *See Cape v. Francis*, 741 F.2d 1287, 1299 (11th Cir. 1984) (concluding that the admission of testimony didn't "prejudice[] [the defendant] in a constitutional sense" where "[t]he remarks were not critically material to the jury's deliberations"). The district court did not err in denying this claim.

### *Pace's Claim That Limiting Evidence of His Eligibility for Parole Violated His Right to a Reliable Sentencing*

The state trial court denied Pace's requests to inform the jury about his eligibility for parole and responded to the jury's question about the possibility of a life sentence without parole by instructing the jury that it "shall not consider the question of parole." On direct appeal, the Georgia Supreme Court concluded that, because "[l]ife imprisonment without parole was not a sentencing option at Pace's trial," the state trial court didn't err in preventing Pace from informing the jury about his parole eligibility and that "[t]he trial court's response to [the] jury note" was "correct," "appropriate[,] and not error." *Pace*, 524 S.E.2d at 845.

Pace argues that the Georgia Supreme Court "applied no federal law in adjudicating [this] claim[]."[5] But, as the district court concluded, that's because there is no clearly established federal law that requires that the jury be told that a defendant is eligible for parole. In *Simmons*, the Supreme Court held that, "where the defendant's future dangerousness is at issue, and state law *prohibits* the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole *ineligible*." 512 U.S. at 156 (plurality opinion) (emphasis added); *see also Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1301, 1302 (11th Cir. 2014) ("*Simmons* requires that a sentencing jury be informed of a defendant's parole *ineligibility* only where the defendant is, as a matter of state law, *absolutely ineligible* for parole and the [s]tate places his future dangerousness at issue." (emphasis added)).

But the Supreme Court has never said that the jury must be informed of the defendant's parole eligibility where, as here, the defendant is parole *eligible*. *See Ramdass v. Angelone*, 530 U.S.

---

[5] Pace also argues that the state trial court "violated [his] rights by responding sua sponte and in the absence of the parties to a jury note asking whether it could sentence him to life without parole." He contends that "by disposing of the jury's question during a critical phase of [his] trial without even notifying the parties, much less consulting them, the trial court deprived [him] of the right to counsel, the effective assistance of counsel, the right to due process, and the right to be present at all stages of his trial as guaranteed under the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution." Because this claim is not part of Pace's certificate of appealability, we do not discuss it further. *See Murray*, 145 F.3d at 1251.

156, 159 (2000) ("*Simmons* is inapplicable to [the] petitioner since he was *not* parole ineligible when the jury considered his case[.]" (emphasis added)); *see also Bates*, 768 F.3d at 1301 ("Since *Simmons* was decided, the Supreme Court has declined to extend its holding to cases where parole ineligibility has not been conclusively established as a matter of state law."). Because Pace was *eligible* for parole, he cannot show that the Georgia Supreme Court's conclusion—that he was not entitled to present that eligibility to a jury—was contrary to or an unreasonable application of clearly established federal law. *See Reese*, 675 F.3d at 1288 ("[I]t is not an unreasonable application of clearly established federal law for a state court to decline to apply a specific legal rule that has not been squarely established by the Supreme Court." (cleaned up)).

## CONCLUSION

The district court did not err in rejecting the five claims listed in Pace's certificate of appealability. We therefore affirm the district court's denial of Pace's section 2254 petition.

**AFFIRMED.**

16-10868                ROSENBAUM, J., Concurring                1

ROSENBAUM, Circuit Judge, Concurring:

I agree with the Majority Opinion that the Antiterrorism and Effective Death Penalty Act of 1996 and our precedent require us to affirm the district court's denial of Lyndon Pace's 28 U.S.C. § 2254 petition. That said, I do not agree with everything in the Majority Opinion's analysis. Rather than nitpick, though, I simply concur in part and separately in the judgment only.

I also want to underscore my disgust at how outrageous the prosecution's conduct in closing argument was. The prosecutor's antics have no place in our system of justice. To recap just a couple of the prosecutor's egregious remarks, he urged the jurors to impose the death penalty rather than send Pace to prison for life because "if anal sodomy is your thing, prison isn't a bad place to be." The despicable nature of this comment speaks for itself. Not satisfied with that, the prosecutor also told the jury to sentence Pace to death because if it did not, it would be "saying that these victims' lives didn't matter." It goes without saying that it is never appropriate or even permissible to attempt to guilt a jury into a death verdict. These tactics aren't close to the line or justifiable. They are squarely and obviously improper.

But when prosecutorial misconduct doesn't render a trial "fundamentally unfair" in "context of the whole trial," we must affirm. *See Darden v. Wainwright*, 477 U.S. 168, 183 (1986); *Reese v. Sec'y, Fla. Dept' of Corr.*, 675 F.3d 1277, 1288 (11th Cir. 2012). That is the case here. So I concur in the judgment because the law requires it.

2                    ROSENBAUM, J., Concurring                16-10868

But that does not make prosecutorial misconduct somehow acceptable.  Almost a hundred years ago, Justice Southerland stated the obvious:  a prosecutor "is not at liberty to strike foul" blows.  *Berger v. United States*, 295 U.S. 78, 88 (1935).  "It is as much [a prosecutor's] duty to refrain from improper methods" he wrote, "as it is to use every legitimate means to bring about a just one."  *Id.*

The prosecutor here had been a member of the Georgia Bar for over twenty years at the time of trial.  Yet he struck many glaringly foul blows.  He certainly should have known better.

Capital cases like this one, where prosecutors have acted improperly, unprofessionally, and unbecomingly, continue to come before us.  Unfortunately, there is little we can do about this kind of behavior in these cases.  Referring offending prosecutors to the relevant Bar is a meaningless gesture because, given that the professional misconduct in these cases generally has occurred decades earlier, the Bar cannot or will not discipline the attorneys.  Similarly, by the time we get the case, the offending prosecutor has often left the prosecuting office, and the responsible supervising attorney is likewise gone from the office, so the prosecuting authority cannot take action against the prosecutor or her supervisor.  In other words, rogue prosecutors face no repercussions for their actions in these kinds of cases.

This type of unprofessional and improper behavior will stop only if the state refuses to accept it in real time.  The state must train its prosecutors to act within the limits of the law and

16-10868          ROSENBAUM, J., Concurring          3

professionalism, and it must hold its prosecutors responsible if they fail to do so.

The state has a tremendous amount of power in a criminal prosecution. And after it secures a guilty verdict in a capital case, it enjoys the wind at its back through the penalty phase. A state's advantage is even greater on habeas review. If the facts warrant imposition of the death penalty, the state's advantages generally ensure that any competent prosecutor can fairly and squarely secure a death verdict. I'd hope that the finality of the death penalty would make every prosecutor want to know that she has followed the letter, spirit, and purpose of the rules.

But for those who don't, make no mistake: a prosecutor who resorts to dirty tricks, cheating, and bullying in pursuing a death verdict—though it may not change the result and thereby amount to a constitutional violation in a given case—stains not just her own name but those of the state who employs her and of our system of justice. Wielding the power of the state in the service of convincing twelve people to put a person to death carries heavy responsibilities. It's well past time that state prosecuting authorities, in real time, require their attorneys to act like it.